## BONSACK MACH. CO. v. S. F. HESS & CO.

(Circuit Court of Appeals, Fourth Circuit. May 28, 1895.)

### No. 103.

**1. False Representations.**

H. & Co., in March, 1887, wrote to the B. Co., which owned the patent for a cigarette machine, asking for the terms of royalty for the use of such machine. In reply, the B. Co. wrote that it required a royalty of 30 cents per 1,000 cigarettes, or 33 cents if a device was printed on the cigarettes, with a guaranty of $200 per month, saying that these were their uniform terms. On April 23d, H. & Co. telegraphed the B. Co. to ship a machine, and wrote them, on the same day, saying they understood the B. Co. gave better terms to others than they offered H. & Co., and asking to have as good terms allowed them as any other house. On April 25th the B. Co. replied to this letter, saying that H. & Co.'s information as to different terms was not correct, that their terms were the same to all. On April 26th H. & Co. wrote the B. Co. not to ship the machine until further orders, as they heard it might be an infringement of other patents; but the machine was afterwards shipped, and received, and used by H. & Co. on the terms offered, without objection on any ground. In September, 1889, H. & Co. requested the B. Co. to send them a second machine, and to waive the $200 per month guaranty, and the extra royalty on printed cigarettes, stating that they understood the B. Co. had a right to make its own terms, but hoped this would be agreed to. The B. Co. agreed to waive the guaranty, but not the extra royalty. In March, 1890, H. & Co. and the B. Co. entered into a formal contract for the use by H. & Co. of the two machines, which provided that the royalty should be 30 cents per

1,000 cigarettes, either printed or unprinted. H. & Co. continued to use the machines and pay the royalty, and at no time made any objection on the ground that better terms were given to other parties. In August, 1890, the contracts were terminated, and the machines removed by the B. Co. In September, 1890, H. & Co. wrote the B. Co., inclosing a final payment of royalty, and claiming a right to demand from the B. Co. the difference between the royalties paid by them and lower rates allowed to others. In March, 1892, H. & Co. sued the B. Co. for this difference, alleging that, in making the contracts, they had relied on the representations of the B. Co. that the terms offered were the same as those given to all others, that such representations were false and fraudulent, and that contracts had at the time been made by the B. Co. with other parties, at lower rates. No evidence was offered to show that H. & Co. were ignorant of the existence of such contracts during their dealings with the B. Co., or that they made any inquiry, after their letter of April 23, 1889. It did appear that the B. Co. had made contracts at lower rates of royalty, in cash, but that in each such contract certain services by the licensee, in advertising the machines, were agreed upon as part payment of the royalty. *Held*, that H. & Co. had not established either that they relied upon or acted upon any false representations of the B. Co., assuming such representations to have been made, so as to entitle them to recover back the royalties paid.

2. SAME—CONTRACTS—INTERPRETATION.

*Held*, further, that the question of the equivalence of the terms allowed to other parties with those allowed to H. & Co. was a material one, and the B. Co. should have been allowed to introduce evidence to show that the terms allowed to such other parties were not more favorable.

In Error to the Circuit Court of the United States for the Western District of Virginia.

This was an action of assumpsit, instituted by S. F. Hess & Co. to recover of the Bonsack Machine Company royalties alleged to have been in excess of the contract price paid by S. F. Hess & Co. to Bonsack Machine Company. The defendant pleaded nonassumpsit.

S. F. Hess & Co. leased one machine for the manufacture of cigarettes from the Bonsack Machine Company in the spring of 1887, and another one in the fall of 1889, besides having used still another machine for a while in the spring of 1888; the price or royalty for the use of the machines being first at 30 cents per 1,000 cigarettes made without any printing of trade-mark or other matter on them, and 33 cents per 1,000 cigarettes with such printing on them. The transactions between the parties constituting the subject-matter of this suit began on or about 22d of March, 1887, and continued until some time in September, 1890, during which time the cigarettes made by S. F. Hess & Co. on the machines, at the royalties aforesaid, amounted to about $17,654.09. During this period three contracts were made between the parties. By the first, which is evidenced only by the correspondence between the parties, one machine was to be furnished to S. F. Hess & Co. by the Bonsack Machine Company, at the royalties aforesaid, for no specified time, the arrangement being liable to be canceled by either party at will. By the second, which was made a little more than two years after the first, and which is likewise evidenced only by the correspondence then had between the parties, another of said machines was to be furnished to S. F. Hess & Co. by the Bonsack Machine Company at rather reduced royalties. By the third and last contract, which was reduced to

writing, and signed by the parties, respectively, dated the 7th day of March, 1890, the terms of the contract in pursuance of which the two machines had been furnished as aforesaid are recited, and the royalty for the use of the machine from and after the 1st day of March, 1890, is fixed at 30 cents per 1,000 cigarettes, regardless of whether printing was done or not on the wrapper of the cigarettes. The Bonsack cigarette machine had been in use several years before S. F. Hess & Co. began to use it. Its reputation had been established, and it had grown largely in favor, when, on March 22, 1887, Hess & Co. wrote to P. A. Krise, addressing him as president of the Bonsack Machine Company, as follows:

"If it please you, inform us by return mail all particulars about your cigarette machines, together with your terms and price for which you lease or sell them, giving the number made by one machine per day, and the power necessary.

"Yours, respectfully,                                                    S. F. Hess & Co. J.

"P. S. How soon could you furnish us one, provided we would want your machine?"

On the 26th of March, 1887, D. B. Strouse, president of the Bonsack Machine Company, replied as follows:

Letter from D. B. Strouse to Plaintiff, dated March 26, 1887.

"Salem, Va., 26 March, 1887.

"S. F. Hess & Co., Rochester—Gentlemen: In answer to your letter dated 22d March, and addressed to P. A. Krise, I have to say that our terms are uniform, and are as follows: We send the machine to the factory, and furnish a man to put it up and run it at our expense. The factory must put up the necessary driver, shafting, and belt, and furnish one or two hands to feed the machine. We require a royalty of 30 cents per 1,000 cigarettes, if not printed, and 33 cents if printed. The machine prints any desired device on each cigarette. The machine weighs 2,000 pounds, and requires less than ½-horse power to run it. It should be placed in a room having good light. The capacity of the machine is from 200 to 220 cigarettes per minute, and is thoroughly constructed and reliable. I suppose you know that the best work in America is that done by our machines. These machines are very expensive, and, owing to their exceedingly quick work, require a careful and experienced operator, and we therefore require a guaranty of $200 per month on each machine in case the royalty should not amount to that sum. The machine will easily yield us $600 per month on royalty, but, as they are often not run on full time, we agree to allow the manufacturers to run or not, as they see fit, so that we receive for no month less than $200. All payments are required to be made at the end of each month for the work packed during the month. We have several machines on hand ready to be set up at once. If the machine fails to give you entire satisfaction, we will remove it at our expense. I say this so that you may have no hesitation in making the order. Our machines are now in eight factories, and are giving much more satisfaction than hand-made work. Hoping to hear from you very soon, I am,

"Yours, very truly,                                                    D. B. Strouse."

Letter of Plaintiff to D. B. Strouse, dated April 4, 1887.

"S. F. Hess & Co.

"Rochester, N. Y., April 4, 1887.

"D. B. Strouse, Salem, Va.—Dear Sir: Please let us know the size fully necessary to run your cigarette machine, and whether a tight or loose pulley is necessary, and the speed necessary to run the same, and width of belt, etc.; and please let us know if there is much of a jar to the running of the machine, as we wish to place the machines on 5th floor. Should we decide to order, and should we order, how soon after receiving order would you be able to ship? Let us hear from you as soon as possible, and oblige,

"Yours, respectfully,                                                    S. F. Hess Co. J."

Letter of Plaintiff to D. B. Strouse, dated April 26, 1887.

"Rochester, N. Y., April 26, 1887.

"Mr. D. B. Strouse, Salem, Va.—Dear Sir: It has been intimated to us that your machine may be an infringement on other parties, which rather upset us, and telegraphed you this a. m. not to ship until further orders. While we know nothing personal about this matter, but to protect us against any suit for infringements, we thought perhaps you would furnish a good bond, and so telegraphed you. The length of cigarette we wish to make will be two inches and thirteen-sixteenths (2 13-16 in.), or rather 2¾ and a 1-16. Trusting that you can give us this protection, so that we can use your machine. Awaiting your earliest reply, we are yours,

"Very respectfully,                                   S. F. Hess & Co.  J."

Letter of Plaintiff to D. B. Strouse, dated April 23, 1887.

"S. F. Hess & Co.

"Rochester, N. Y., April 23, 1887.

"Mr. D. B. Strouse, Salem, Va.—Dear Sir: We telegraphed you this day to ship machine at once, provided you can furnish us same quality paper as the bobbin you sent us; also to ship us one case of the paper. Now, Mr. Strouse, we must have good paper, and wish to impress you with the fact, and hope you will not fail to get it for us to start with. Also send us first-class man to run machine, for you know we have two other machines in this city to compete with, and don't want to be outdone. Write us all the particulars about what is necessary to be done in advance of machine and man, so that when it arrives there will be as little delay as possible in getting started. Now, give us as good terms in contract as you can, and as good as you give any other house. We understand you give better terms than you offer us. If you are liberal with us, so that we are able to compete with our neighbor, we expect to use more of your machines. Since we have been corresponding with you, parties have made an effort to have us use other machines, but we prefer yours, but at same time want as liberal lease as you give others, and trust that you will do so. Awaiting your reply, we are

"Yours, very respectfully,                            S. F. Hess & Co."

Letter from D. B. Strouse to Plaintiff, dated April 25, 1887.

"Lynchburg, Va., 25 April, 1887.

"Mess. S. F. Hess & Co., Rochester—Gentlemen: This firm will ship you to-morrow 100 reels of paper, just such as the sample, except that the sample reel is glazed on the sides of the reel and this is not. I also cabled Abodie & Cie to ship you 100 reels, which will give you 200 reels of paper. A reel of paper will make 20,000 cigarettes. You can make your own calculations as to other orders. It is best to keep at least 90 days ahead. Your information as to our giving any manufacturers different terms from those I have given you is not correct. Our terms are the same to all. I wired you to-day as to printing cigarettes. If you want to print your cigarettes, we have to have a steel die cut to do the printing, hence I must have the words or device you wish to print, which should be as small as possible. I must also know the length of the cigarette you want to print. The die makes one revolution for each cigarette, and its circumference must correspond with the length of the cigarette. We prefer not to print, but never decline to do so. Will write you as to other details to-morrow.

"Yours, truly,                                        D. B. Strouse."

"Rochester, N. Y., Sept. 9, 1889.

"D. B. Strouse, Salem, Va.—Dear Sir: Yours of the 2d to hand, and note your remarks in regard to machine, &c., and now write to say our future for an increase in trade is very promising, and we feel confident that we will soon have all we can do for 2nd machine, and will want the third soon; but you know we have had a struggle, and up to the present time we have not made a dollar on cigarettes, while you have been paid your royalty; and we now feel, in view of all the circumstances, that you ought to send us the second machine, and allow us to pay for what we pay per month at rate of 30 cents per M., and if we do not make enough to pay you for both, that you should not compel us to pay $200 per month; but of course at any time that

you do not feel that you can afford to leave the second machine in our factory you can order it away, unless we then conclude to pay you the royalty of $200 per month. Still we feel confident that we can make and sell easily enough to pay you the royalty, but of course we cannot positively say, as no one can tell what the future will be. We understand that you have a right to make your own terms, and we make the above suggestions. Trusting you will comply with our wishes so far as you can, and send us another machine at once, on the best terms possible, we are

"Yours, respectfully,                                  S. F. Hess & Co."

### Answer of Strouse.

"Salem, Va., Sept. 13, 1889.

"Messrs. S. F. Hess & Co., Rochester, N. Y.—Gentlemen: I have your letter of the 9th inst. I cannot understand why it was so long reaching me. I will send you another machine just as soon as I can, and will send it on the terms suggested in your letter, except that we will of course expect 33 cents per M. for printed work. We can modify the terms as to guaranty, but not as to royalty. We hope to ship your machine within ten days.

"Yours, truly,                                  D. B. Strouse.

"I prefer that you say nothing of ordering or receiving another machine.

"D. B. S."

"Rochester, N. Y., Sept. 6, 1890.

"P. A. Krise, Treasurer, Lynchburg, Va.—Dear Sir: Inclosed we hand you statement of cigarettes made on the Bonsack machines during the month of July, and draft for $485.85, covering royalty on the same. We desire to inform you that we do not construe this payment to be a waiver on the part of S. F. Hess & Co. of any claim against your company for a breach of your agreement with us. We have paid you at the rate of 30 cents per M. for all cigarettes made on your machines, and we shall ask you to make us good between that amount and the lowest rate given by you to other manufacturers while we were using your machines.

"Yours, truly,                                  S. F. Hess & Co.

"1619½ M., at 30, $485.85."

### Contract of S. F. Hess with Bonsack Machine Co., dated March 7, 1890.

"Whereas, S. F. Hess & Co., of Rochester, New York, are using two Bonsack cigarette machines, which are owned and operated by the Bonsack Machine Company on a royalty of thirty cents per thousand cigarettes for cigarettes not printed, and thirty-three cents per thousand for cigarettes which are printed, which two said machines are subject to removal at any time at the will of either the said S. F. Hess & Company or of the Bonsack Machine Company: It is agreed: First. That the royalty to be paid by the said S. F. Hess & Co. to the Bonsack Machine Company from and after the first of March, 1890, shall be thirty cents per thousand (1,000) cigarettes, whether the same be printed or not. Second. That the said S. F. Hess & Co. shall have the right to continue to use the two said machines up to the thirty-first day of January, 1891, and shall deliver to the Bonsack Machine Company, or to its order or agent, the two said machines on the first day of February, 1891, without hindrance, delay, or default, on any account whatsoever, provided that the said S. F. Hess & Co. have the right to deliver the said machines to the Bonsack Machine Co. at any time prior to the first day of February, 1891, and provided also, since contingencies may possibly arise which may cause the Bonsack Machine Company to prefer to indefinitely continue its machines in the factory of the said S. F. Hess & Co., that the Bonsack Machine Company shall, in case the said S. F. Hess & Co. shall not have surrendered the said machines, give to the said S. F. Hess & Co. notice in writing of its intention to remove the said machines on the first day of February, 1891, which notice shall be given at least sixty days before the first day of February, 1891, and, upon such notice being given, the said machines shall be surrendered on the first day of February, 1891, without hindrance on any account whatsoever.

"Witness the following signatures this 7th day of March, 1890.

"S. F. Hess & Co.

"Bonsack Machine Co.

"By D. B. Strouse, Pres."

In their declaration in the court below Hess & Co. set out their case as follows:

"And the said plaintiff further avers the said contract was made and entered into by the said plaintiff upon this express agreement, understanding, and representation by the said defendant; and the said defendant, to wit, on or about the month and year aforesaid, in its correspondence and in its negotiations, and in its agreement concerning the use of said machines by the plaintiff, expressly promised and undertook that the said royalty of thirty cents and thirty-three cents per thousand for cigarettes of that character was and should be the fixed and uniform royalty then charged and thereafter to be charged by it for the use of such of its machines as were then in use by manufacturers of cigarettes, or which should thereafter be hired to or placed by said defendant with such manufacturers for use in making cigarettes, and that there was and should be no discrimination made against said plaintiff in the royalty so charged as aforesaid for the use of said machines. And the said plaintiff further avers that, relying upon the said representation, agreement, and assurance, and upon the said promise and undertaking of the said defendant that the said royalty so charged the defendant as aforesaid was the fixed and uniform charge to all manufacturers of cigarettes for the use of its said machines, and that there was and should be no discrimination made against the plaintiff in the royalty charged for such use, the said plaintiff did pay to the said defendant monthly during said period, to wit, from the —— day of April, 1887, to the —— day of September, 1890, an amount to the sum, to wit, of $17,654.09, royalties so agreed to be paid, and in all other respects faithfully complied with their said contract. And yet the said plaintiff avers that the said defendant, wholly disregarding its said agreement, representation, and assurance, and its said promises and undertaking, had, before the making of the said contract with the said plaintiff, secretly and fraudulently let and hired out its said machines to other manufacturers of cigarettes, rivals and competitors in the making and sale of cigarettes of said plaintiffs, among them W. Duke, Sons & Company, doing business in the city of Durham, in the state of North Carolina, and in the city of New York, on or about, to wit, the 11th day of June, 1885, and to the Lone Jack Cigarette Company, doing business in the city of Lynchburg, in the state of Virginia, on or about, to wit, September, 1885, not at the said royalty of thirty cents per thousand agreed, promised, and undertaken by it with the plaintiff to be its fixed and uniform royalty to all manufacturers using its machines, but to the said W. Duke, Sons & Company at a royalty of, to wit, twenty (20) cents per thousand cigarettes, and to the said Lone Jack Cigarette Company at a royalty of, to wit, fifteen cents per thousand cigarettes, which said contracts of hire and letting were craftily concealed from this plaintiff, although in full force between the parties thereto during the entire said period from the —— day of April, 1887, to the ——— day of September, 1890, during which period the said plaintiff was using and paying said royalty on said machines as aforesaid. And the said plaintiff avers that it was altogether ignorant of said other contracts with said other manufacturers of cigarettes by said defendants until a long time after the 1st day of August, 1890, at or about which time said plaintiff ceased to use said machines. Wherefore the said plaintiff says that the said defendant, not regarding its said contract, promise, and undertaking, hath craftily broken the same, contriving and intending to deceive and defraud the plaintiff in the premises, and the said defendant hath not paid or returned to the said plaintiff the large sums so overpaid it monthly during the said period as aforesaid by the said plaintiff, amounting in whole to the sum of, to wit, $8,837.64, although requested so to do, but hath hitherto wholly refused and neglected, and still does so refuse and neglect. Therefore the said plaintiff says that, by reason of the premises, he is injured and hath sustained damage to the amount of $12,000."

The declaration complains of no contracts in conflict with the alleged stipulation of the Bonsack Company that none should have better terms than those granted to Hess & Co. other than one with

Duke & Sons, and another with the Lone Jack Company. These contracts were respectively as follows, so far as material:

### The Duke Contract.

"This agreement, made this 11th day of June, 1885, between the Bonsack Machine Company and W. Duke, Sons & Co., witnesseth, that whereas, the manufacturers of cigarettes who use the Bonsack machines, except the Lone Jack factory, have so far declined to put the machines on their fine brands, for the reason that they fear that there may be a prejudice against machine-made work, which might injure the sales of their goods, and whereas W, Duke, Sons & Co. are willing to put the machines on their best brands, and to do all their plain work on the Bonsack machines: Now, therefore, it is agreed that the said W. Duke, Sons & Co. will at once put two machines on their finest brands, and as fast as practicable will relieve themselves of brands until they do all their plain work on the machines, and in consideration of this undertaking the Bonsack Machine Company agree to allow W. Duke, Sons & Co. from this day a drawback which will reduce their royalty to twenty-four cents per one thousand cigarettes, whether printed or not, and as soon as they shall make their entire plain work of all brands and qualities on the said machines their drawback shall be such as to reduce their royalty to twenty cents per 1,000 cigarettes. The amount paid on which such drawbacks are allowed is thirty cents for nonprinted work and thirty-three cents for printed work. And it is agreed that this arrangement is permanent, unless the said W. Duke, Sons & Company shall divulge the same, or unless they shall fail to put the machines on their fine work as above stated, in which event the Bonsack Machine Company may, at its pleasure, refuse thereafter to allow the said drawback."

### The Lone Jack Contract.

"This agreement, made this 30th day of September, 1885, between the Bonsack Machine Company, of the first part, and the Lone Jack Cigarette Company, of the second part, witnesseth, that the said party of the second part shall use the machines of the said party of the first part for the manufacture of their cigarettes, paying therefor the sum of thirty cents per 1,000 for nonprinted work and thirty-three cents per 1,000 for printed work, payable at the end of each month. And it is agreed that the Lone Jack Company shall advertise their goods as made on the Bonsack machines, and by such advertisements bring into favorable notice the Bonsack cigarette machines, and that the Bonsack Machine Company shall contribute in monthly payments, payable at the end of each month, in cash, to the Lone Jack Cigarette Company, a sum of money equal to fifteen cents per 1,000 cigarettes made during the preceding month and not printed, and a sum equal to —— cents per 1,000 cigarettes on the printed work made during the preceding month by the Lone Jack Cigarette Company; such payments to be in full satisfaction and payment, upon the part of the Bonsack Machine Company, for the advertisements to be made by the Lone Jack Cigarette Company as aforesaid."

Neither of these contracts contained a clause imposing secrecy upon either party to it.

At the trial of the case the Bonsack Company offered to read two depositions, one of James B. Duke, a member of the firm of W. Duke, Sons & Co., and W. H. Butler, an officer of the Kinney Tobacco Company, which was a large manufacturer of cigarettes. The court refused to allow the two depositions to be read. The following are extracts from them, respectively. That of James B. Duke contained the following passages:

"Q. 11. You have said that Kinney Tobacco Company knew of the contract with W. Duke, Sons & Co. before Kinney Tobacco Co. contracted for the use of the Bonsack machines. Please state what rate of royalty the Kinney Tobacco Co. paid for the use of the Bonsack machines. A. 11. Thirty cents per thousand.

"Q. 12. In your judgment, what was the value to the Bonsack Machine Co. of the services rendered by W. Duke, Sons & Co., together with the money consideration paid by it, as compared with the price paid by Kinney Tobacco Co., the same being, as you say, a money consideration alone of thirty cents per thousand? A. 12. In view of the risk, W. Duke, Sons & Co.'s terms were not so favorable; in other words, I will say that the service rendered by W. Duke, Sons & Co., together with the money consideration, in my judgment, was worth more than the thirty cents per thousand cigarettes.

"Q. 13. What, if anything, was said to Mr. D. B. Strouse by you and Francis S. Kinney, Esquire, president of the Kinney Tobacco Co., at the time you were negotiating for Bonsack machines in 1888, relating to the terms of the contract the Bonsack Machine Co. had made with W. Duke, Sons & Co.? A. 13. We stated to Mr. Strouse that we considered that W. Duke, Sons & Co. were entitled to all they received. We regarded the services of W. Duke & Sons, as they were the first manufacturers who successfully brought the product of the machines to the favorable attention of the public, as being more than equivalent to the difference in the money considerations paid."

The deposition of W. H. Butler contained the following passages:

"Q. 7. What was the result of the corporation of W. Duke, Sons & Co. making its entire work on the Bonsack machines, so far as relates to the other manufacturers making use of the Bonsack machines? A. 7. It demonstrated that machine-made cigarettes might supplant hand-made cigarettes. The result was that the other large manufacturers largely adopted machines for making their work, and to-day ninety per cent. of the cigarettes made in this country are made on the Bonsack machines, I think.

"Q. 8. What was the probable value of the services rendered by the corporation W. Duke, Sons & Co. in placing the Bonsack machines prominently and favorably before the public, together with the money consideration paid by W. Duke, Sons & Co., as compared with the rate of royalty of thirty cents per thousand for nonprinted cigarettes and thirty-three cents per thousand for printed cigarettes? A. 8. I consider that the value to the Bonsack Machine Co. of the services rendered by the corporation W. Duke, Sons & Co., together with the money royalty paid by it, was more than equal to paying the Bonsack Machine Co. thirty cents per thousand for nonprinted and thirty-three cents per thousand for printed cigarettes."

The defendant's bill of exceptions states that it—

"Offered to introduce witnesses Edmund Schaefer and J. Stewart Walker to show by them that they were for many years associated as officers in the conduct of the business of the Lone Jack Cigarette Company, and were well acquainted with the contract relations between the Lone Jack Cigarette Company and Bonsack Machine Company, before and after the year 1885, touching the renting of the machines of the latter company; that the Lone Jack Cigarette Company paid for the renting of the said machines royalties of 30 cents per thousand cigarettes nonprinted, and 33 cents per thousand cigarettes printed, of which 15 cents was paid in money and balance in services,—that is to say, in consideration of said money reduction, the Lone Jack Cigarette Company agreed to advertise, and did advertise, their cigarettes as made on the Bonsack machines, and by its advertisements to bring said machines into favorable notice; that the said Lone Jack Cigarette Company agreed to render and did render services to the Bonsack Machine Company in furnishing opportunity to its operatives in its factory so as to make them skilled and prepared to be sent off for service in any factories where said machines were used, and allow the machines and tubes of the Bonsack Machine Company to be tested in its factory, the said Lone Jack Cigarette Company finding tobacco and paper for the purposes of all such tests; that this undertaking on the part of the Lone Jack Cigarette Company caused it many and serious interruptions and inconveniences, and resulted in large losses of tobacco and materials, so that this undertaking on the part of the Lone Jack Cigarette Company jeopardized its business so that they were losers in business, and finally had to wind up; and that the witnesses would testify positively that in their judgment the royalty paid to the Bonsack Machine Company in the shape of money and services as afore-

said exceeded in fair values the money paid by Hess & Co. of 30 cents for nonprinted and 33 cents per thousand for printed work."

The court below refused to allow the witnesses, Schaefer and Walker, to testify. No evidence was given on the trial by the plaintiff below, Hess & Co., to sustain the averment of the declaration that the plaintiff was ignorant, until after the 1st day of August, 1890, of contracts made by the Bonsack Company giving better terms than had been accorded the plaintiff. A good deal of evidence at the trial below related to an answer in equity, which the Bonsack Company had prepared, and left for a few weeks in the clerk's office, to a bill which had been exhibited against it by the Lone Jack Cigarette Company in the circuit court of Lynchburg, on May 1, 1890. The answer had never been filed or used in the suit, and was soon withdrawn from the clerk's office by the Bonsack Company. The suit itself never came to a trial. This answer was offered in evidence by Hess & Co. in the trial below of the present suit, and, against the objection of the Bonsack Company, was allowed by the court below to go to the jury. The chief object of Hess & Co. in using this alleged answer as evidence at the trial below was to show that the Bonsack Company had denied in that paper the claim they were making at the trial, that the services rendered by the Lone Jack Cigarette Company, and stipulated for by the contract, were of material value to the Bonsack Company. The answer alleged, among other things, that most of the stock of the Lone Jack Company had been taken and was held by parties who owned stock in the defendant company. It alleged, furthermore, that the main reason that defendant company agreed with the plaintiff company to reduce royalties was that the latter company had not succeeded. It claimed to have lost money. Its stockholders being principally officers and stockholders of the defendant company, who had embarked in the new enterprise of manufacturing cigarettes, induced and persuaded the defendant company to make a reduction in royalty, thus insuring its success, and at the same time preventing it from being said that any manufacturers who had taken hold of said machine had failed, or done other than succeed. The answer, except so far as this paragraph did so, did not deny that the object of the contract with the Lone Jack Company was to secure the services indicated by the contract itself, but rather that the Bonsack Company had not realized their expectations in that respect.

At the trial below, the Bonsack Company, by its attorneys, moved the court to give to the jury the following instructions:

#### Instructions Prayed for by Defendant.

"(1) The court instructs the jury that for the plaintiff to recover in this action they must believe from the evidence that by the contract between the parties to this suit it was agreed that no one using defendant's machines then had, or should thereafter have, machines for less royalty than that provided to be paid by the plaintiff, and they must further believe that other parties did then have, or were thereafter furnished, machines by the defendant at less royalty. And in considering the royalties paid by other parties the jury is instructed to take into account not only the money royalty that may have been paid by other parties, but other consideration, such as services, etc., as well, at a fair, honest, and equivalent value.

"(2) The court instructs the jury that the answer of the defendant in the

case of the Lone Jack Cigarette Company against the defendant must be considered by the jury in reference to that suit; and the defendant is not precluded by any statement made in that answer, but the amount of royalty paid to the defendant by the Lone Jack Cigarette Company, whether in money, services, or otherwise, depends upon all the proofs in this case relating to that matter.

"(3) The court instructs the jury that, while it may consider the answer of the Bonsack Machine Company in the suit brought against it by the Lone Jack Cigarette Company as tending to show the construction the Bonsack Machine Company at that time placed upon the contract which it had made with the Lone Jack Cigarette Company, yet the same may be overcome or explained by other testimony, and in determining the true construction of and real intent of the said contract they must consider all the testimony that has been introduced touching that subject as tending to explain or rebut the admissions in the answer of the Bonsack Machine Company, so far as the said admissions bear upon the issue in the case on trial.

"(4) The court instructs the jury that for the plaintiff to recover in this action it must appear to the jury by a preponderance of testimony that the defendant company has broken or failed to perform its part of the contract made between the plaintiff and defendant, and that the plaintiff has sustained damages by such breach of the contract, and the jury can find only so much of the amount demanded in the declaration as the plaintiff has shown it sustains as a loss by reason of such breach of the contract.

"(5) The court instructs the jury that, should they believe from the evidence that the language contained in the two letters, one of the 26th of March, 1887, and the other of the 25th of April, 1887, when viewed in the light of other correspondence of the parties, the subsequent written contract, and other evidence was not relied upon by the plaintiff, and was not intended by the parties to be incorporated into the contract, then they must find for the defendant; and in estimating the royalties, upon which they shall base their verdict, in case they find for the plaintiff, they must exclude all such royalties as accrued after and under the written contract, dated March 7, 1890.

"(6) The court instructs the jury, if they believe from the evidence that the clauses contained in the two letters of the 26th of March and the 25th of April, 1887, now relied on by the plaintiff in this suit, viewed in the light of other correspondence of the parties, of the plaintiff's written contract of March 7, 1890, and of other evidence, were not relied upon by the plaintiff when he leased the defendant's cigarette machines, or were not intended by the parties to be incorporated into the contract, then they must find for the defendant. And said clauses, and the provisions contained in them, not having been embraced in the said contract of March 7, 1890, there can be no recovery, in any event, on account of the royalties accruing after the date of said contract.

"(7) The court instructs the jury that the burden is on the plaintiff corporation to show that it paid to the defendant corporation the 30 and 33 cents per thousand, without knowledge of a lower rate or royalty being given by the defendant to others; and if they shall, from the evidence, believe that the plaintiff has failed to prove by a preponderance of evidence that said payments were made without knowledge of a lower royalty to others, then they must find for the defendant.

"(8) The court instructs the jury that if they believe from the evidence the defendant contracted it had not and would not furnish machines to others at a royalty or rate lower than 30 cents per 1,000 cigarettes nonprinted, and 33 cents per 1,000 cigarettes printed; that said defendant has violated said contract, and that said plaintiff has not proved it has sustained damage thereby, —then they shall find only nominal damages in favor of said plaintiff.

"(9) The court instructs the jury that under the pleadings in this cause, to enable the jury to find for the plaintiff, the burden of proof is on the plaintiff to show—First, that the contract set out in the declaration is the contract which was made between the parties; second, that the defendant has violated the said contract; third, that the plaintiff has been damaged by such violation of the contract; and, fourth, the amount of the damages which the plaintiff has sustained by reason of the violation of the said contract by the defendant.

"(10) The court instructs the jury that all prior negotiations and contracts between the plaintiff and defendant relating to the hiring or leasing of machines by defendant to plaintiff are merged in the contract between said parties of the 7th of March, 1890, and if they believe from the evidence that there has been no breach of said contract of the 7th of March, 1890, then they must find for defendant."

To the giving of said instructions, or any of them, the plaintiff, by its attorneys, objected, and the court sustained the objection, and refused to give the instructions, and each of them, in the form in which they were presented. And thereupon the plaintiff company, by its attorneys, moved the court to give to the jury the following five instructions:

### Instructions Prayed for by Plaintiff.

"(1) The court instructs the jury that the correspondence between the plaintiff and defendant, which has been introduced in evidence and read to the jury, constitutes a contract between the parties. And upon the subject of royalty, or compensation to be paid by the plaintiff to the defendant for the use of the defendant's machines, said contract was that the rate of said royalty should be thirty cents per thousand for all cigarettes not printed and thirty-three cents per thousand for all printed cigarettes; and this rate of royalty, or compensation for the use of defendant's machine, to be paid by the plaintiff, was based upon the assurance given by the defendant to the plaintiff that such rate was in accordance with the terms of the defendant, which were uniform, and not different from those given to any other manufacturer, and that said terms were the same to all.

"(2) And if the jury believe from the evidence that the defendant company, before and at the time when the plaintiff was using its said machine, had contracted with, and did allow the use of the said machine by, other persons engaged in the manufacture of cigarettes upon terms different and more favorable than those required of the plaintiff, such conduct was a breach of said contract by the defendant company.

"(3) The court further instructs the jury that if they believe from the evidence that the contract between the plaintiff and the defendant company has been broken by the defendant company, the measure of the damages to which the plaintiff is entitled is the difference between the royalty paid by the plaintiff to the defendant company and the royalty paid by the Lone Jack Cigarette Company, or that paid by the Duke, Sons & Co. to the defendant, whichever royalty may be the smaller paid by either of said companies. And in estimating the royalty upon which they shall base their verdict in case they find for the plaintiff, they must exclude all such royalty as accrued after and under the written contract dated March 7th, 1890.

"(4) The court instructs the jury that the answer of the defendant company in the case of the Lone Jack Cigarette Company against the defendant company, which has been introduced in evidence, must be considered by the jury in reference to the bill as an answer to which it was prepared, and only so much of said answer must be considered as bears upon the issue now being tried, as defined by the rulings of the court.

"(5) The court further instructs the jury that when the plaintiff, in the letters to the defendant company, inquired the terms and price for which the defendant company leased its machines, and stated that plaintiff understood that the defendant company gave better terms than offered to the plaintiff, it was the legal duty of the defendant company to inform the plaintiff of the terms of any contract it may have had with other parties which were different and better than those offered to the plaintiff."

To the giving of these five instructions the defendant objected, which objection was overruled by the court, and the instructions given. The trial resulted in the following verdict:

"We, the jury, find for the plaintiff, and assess its damages at the sum of eight thousand two hundred and thirty-two dollars and twenty-nine cents,

with interest on $6,999.69, a part thereof, from the 8th day of January, 1892, until paid."

A. H. Burroughs and T. J. Kirkpatrick, for plaintiff in error.

W. W. Crump and R. H. G. Kean, for defendant in error.

Before SIMONTON, Circuit Judge, and HUGHES and SEYMOUR, District Judges.

HUGHES, District Judge (after stating the facts as above).    The case will be considered principally on the merits.    The suit below grew out of the use, by Hess & Co., of cigarette machines made exclusively by the Bonsack Company, at royalties per 1,000 cigarettes made by the machines, and rented to manufacturers.    Hess & Co., after paying all royalties claimed by contract for several years, finally sued to recover back what they claimed to have been overpaid by them, under an alleged deception practiced upon them by the Bonsack Company throughout the dealings.    The transactions between Hess & Co. and the Bonsack Company lasted from March, 1887, until September, 1890.    The suit below was not brought until March, 1892. The charge of the plaintiff was that "a gross fraud was practiced on S. F. Hess & Co., as part of a deliberate and systematic course of cheating in the matter of royalties paid; the Bonsack Company having declared and promised the plaintiff, Hess Co., that their royalties were uniform and invariable, not different in any case, when the fact was that those charged the Lone Jack Company were at that very time, and had been for near two years, about one-half of what was so quoted as the 'same to all'; and that those charged the Dukes were about 10 and 13 cents less than what they represented as uniform and invariable, with a sliding scale, which gave the Dukes 25 per cent. less than any reduction to others."    As early as the 23d April, 1887, Hess & Co. wrote that they had information of better terms being given to others than had been offered themselves by the letter of Strouse, written on the 26th March preceding.    They were, therefore, on inquiry as to these terms as early as April, 1887, and remained so during all their dealing with the Bonsack Company. Whether inquiry was made or not, they ordered, a year afterwards, a second machine, without allusion to better terms to others in requesting and accepting it, when delivered.    They wrote as late as September 9, 1889, to Strouse, asking for a third machine, requesting to be allowed to pay 30 cents per 1,000 cigarettes with release from the requirement to pay $200 per month absolutely, and declaring to Strouse that "he had the right to make his own terms."    Thus Hess & Co., as long as 17 months after beginning to use the Bonsack machine, and after hearing of better terms to others, asked Strouse to change the terms alleged to be required of all in their own favor, and recognized Strouse's right to make his own terms.    In doing so, they put the Bonsack Company off its guard, if it was really granting better terms to others, by giving assurance that no advantage would be taken of such departure from the usual terms by themselves. Strouse replied on the 13th September, granting the liberal terms requested; and Hess & Co. accepted these terms, which were such as they had assured Strouse he had the right to grant.    The dealings

between the two concerns went on from that time on the new basis; Hess & Co. having been informed as long as 17 months before that better terms than 30 and 33 cents per 1,000, with $200 per month absolutely, had been given by Strouse to others, and themselves participating in the better terms which they had solicited and accepted in September, 1889. On the 7th March, 1890, all contracts that had arisen between the two concerns were merged, at the instance of Hess & Co., in the contract of that date, and Hess & Co. again accepted terms still better than those they had enjoyed since September, 1889. By this last contract they accepted a release from the payment of the three cents of extra money for cigarettes in printed covers, all previous concessions being continued in the consolidated agreement. This last contract remained in force until the close of all dealings in August, 1890. Here was not only knowledge that the Bonsack Company was not rigidly uniform in their terms to all who used their machines, but an express acknowledgment of its right to make its own terms with each manufacturer of cigarettes; they themselves being special beneficiaries of important modifications and better terms, solicited by themselves. A critical examination of the earlier correspondence between the two concerns will show that the contract for the first machine received by Hess & Co. was consummated before the matter of better terms to others became a subject of correspondence. The contract was completed in the letters of the 22d March, 26th March, and the telegram of 23d April, 1887. In none of these had the idea of better terms to others found expression. Nothing had been said before the telegram of Hess & Co. ordering the first machine had been sent and received, relating to better terms. In the letter of Hess & Co. dated on the 23d and received by Strouse on the 25th April, 1887, two days after the first machine had been ordered by them, they first make mention of the subject. They had ordered the machine after hearing that better terms were enjoyed by other manufacturers. Before receiving any assurance from Strouse that his terms were the same to all, and with the knowledge that this charge was current against Strouse, they ordered the first machine. It was in reply to the intimation in the letter of the 23d that Strouse said, on the 25th April: "Your information as to our giving manufacturers different terms from those I have given you is not correct. Our terms are the same to all." Strouse does not say that the information is not true or is false; but he says it is not "correct,"—it is not an accurate account of the matter. This declaration, positive as it is, and positively untrue as it is, so far as his using the phrase "different from" instead of "same to all" could make it so, could not have applied to the machine which had already been ordered. It could only apply to the two machines which were subsequently ordered. It is true that the order for the first machine, made on the 23d, was countermanded on the 26th, April, the evidence not showing whether or not it had then been sent. But the countermand was not because Hess & Co., as intimated by their counsel in their brief, were hesitating on the rumor of better terms to others, but because of what they call an "intimation" to them that the Bonsack machine might be an infringement on other patents.

The temporary countermand for such a reason could not affect the contract for the first machine, which had been completed by the telegram of the 23d April. Does the expression "same to all," used by Strouse on the 25th April, 1887, apply to the second and third machines subsequently ordered and received by Hess & Co.? The second one was furnished some time in the spring of 1888, a year after Hess & Co. had made their suggestion of better terms to others, and without any mention again of that subject by Hess & Co. The contract on which this machine was sent and received was not written, either in correspondence or special writing. Whether it contained an implied stipulation, arising out of Strouse's letter of April 25, 1887, that the terms respecting it should be as favorable as were granted to any other manufacturer, is a question open to debate. When this second machine was sent to Hess & Co., they had had the idea in their minds of better terms to others for a year, and they ordered and received it without objection on that score. The third machine sent to Hess & Co. was sent in response to their letter of September 9, 1889, and in compliance with Strouse's reply to it four days afterwards. It was sent and received under the contract embodied in those letters. The terms stipulated in the correspondence had been solicited and granted upon an express assurance from the receivers that the owner of the machine had a right to make the terms solicited and conceded. Hess & Co.'s letter of the 9th September in very words contained a concession that the Bonsack Company had a right to modify their terms at their own pleasure to particular manufacturers, and contained, by necessary implication an assurance that Hess & Co. would not object if it were or should be a fact that better terms than those stated in Strouse's original letter of March 26, 1887, were given to other manufacturers. Hess & Co. themselves received and became beneficiaries of better terms, and by accepting them, and by the assurance given in their letter, waived all objection on that score to better terms to others.

It may be concluded, therefore, we think, that this matter of better terms to others did not affect either the first machine received by Hess & Co. or the third one, and could only apply, if at all, to the second machine. Be this as it may, however, and assuming, for the sake of argument, that the Bonsack Company had, before the 23d of April, 1887, and afterwards, given better terms to other cigarette manufacturers than they gave to Hess & Co., in respect to either or all of the machines, the question arises whether or not the latter are in position to be entitled to recover as they claim in the suit below; for no principle of law can be more obvious than that a plaintiff must recover on the strength and merits of his own case, and, these being wanting, cannot recover exclusively on the weakness and demerits of the defendant's case. From what has been said, it is plain that the averment in their declaration that Hess & Co. were ignorant of other contracts giving better terms to others, until after August, 1890, was a necessary one. It is, in fact, the crucial question in this litigation. Hess & Co. contend that the Bonsack Company were estopped by Strouse's letters of March 26 and April 25, 1887,

from receiving from themselves any greater royalties on the work of the machines sent them than the lowest that were accepted from any other manufacturers. But they cannot claim a corresponding abatement from such royalties as they actually paid, unless they show that these latter were paid by them in ignorance of the fact that lesser royalties were accepted by the Bonsack Company from others. Such ignorance is a necessary ingredient of estoppel by conduct. Bigelow says (page 480) among other essentials of estoppel is the fact that the injured party must have been ignorant of the truth of the matter. We shall refer to another necessary ingredient in the sequel. The averment of this ignorance was therefore necessary in Hess & Co.'s declaration. Unlike a bill in chancery, the averments in which are sworn to as true by the complainant, a declaration at common law is merely the work of lawyers, the averments in which are strictly technical, and do not necessarily touch the conscience of the plaintiff. They are not taken to be true. They must be affirmatively proved by evidence,—evidence which, to be valid, must in general have the sanction of an oath, and be taken with opportunity for cross-examination. It was necessary, therefore, at the trial below, for the ignorance averred by the declaration to have been affirmatively proved. This could have been done by the testimony of the members of Hess & Co., or either of them, or by other competent evidence. But the averment was left unproved at the trial, no evidence whatever having been offered in support of it. Neither of the plaintiffs was put on the stand. It is an inference of law, therefore, that the ignorance averred by the declaration did not exist, and was not, for that reason, proved. In point of fact, such ignorance was quite improbable. During the entire period of their operating the Bonsack machines these plaintiffs had had in mind the idea—whether they believed it or not—that better terms were enjoyed by other manufacturers. They went on, nevertheless, using the machines, without objection on this score, for two years and a half, making no complaint to the Bonsack Company. It was not until after the machines were withdrawn from them, in August, 1890, that they complained of the existence of contracts with others granting better terms. All their payments of royalty throughout that long period had been made without protest, and it was not until September, 1890, that they disclosed to the Bonsack Company a knowledge of such contracts in making their last remittance. This disclosure was contained in their letter of September 6th, in which they say:

"We desire to inform you that we do not construe this payment to be a waiver on our part of any claim against your company for a breach of your agreement with us. We have paid you at the rate of 30 cents per thousand for all cigarettes made on your machines, and we shall ask you to make us good between that amount and the lowest rate given by you to other manufacturers while we were using your machines."

This letter, as before stated, was dated on the 6th September, 1890, and the averment in their declaration was that they were ignorant on this score "until long after the 1st of August, 1890." The fact that Hess & Co. did not bring their suit for reclamation

until March, 1892,—18 months after the letter containing the language quoted, and inclosing the last remittance,—suggests that their delay and hesitation in bringing suit were due to their conscious doubtfulness of their ability to prove this ignorance. The fact was that they had not labored under this ignorance. They did become cognizant during the period in which they were using Bonsack machines that the terms were not uniform, for they themselves, during that 2½ years, solicited and obtained several modifications in their own favor of the "uniform" terms. And how could they suppose, when these modifications were granted to themselves, that the Bonsack Company would immediately proceed, in consequence, to make similar modifications in the terms under which all other manufacturers using their machines were operating? Such a supposition would have been very strained. The fact that Hess & Co. solicited, obtained, and enjoyed better terms than those which Strouse had declared on the 26th March, 1887, to be "uniform," and on the 25th of April following to be the "same to all," shows that they were not ignorant of different terms having been accorded. The fact proves that they were cognizant of such terms during a large part of, if not throughout, the period of their use of the Bonsack machines. Being so, were they not giving the Bonsack Company reason to believe that they wittingly waived the alleged guaranty of uniform rates; and are not they themselves debarred by their own acceptance of different rates from claiming the drawbacks which they seek to recover by their suit? Moreover, when they declared that the Bonsack Company had a right to make its own terms, requested a change of the "uniform" terms in their own favor, and, this being granted, accepted and enjoyed better terms solicited by themselves, making no protest until after the business had come to an end, did they not impliedly guaranty the Bonsack Company that no reclamations would be demanded or expected by themselves? We think so, and that their waiver misled the Bonsack Company.

The correspondence shows that, in the course of the dealings between these two concerns, Hess & Co. frequently requested favors modifying the "uniform" terms stated in detail by Strouse in his letter of March 26, 1887. They requested leave to keep a machine idle, they solicited a release from the payment absolutely of $200 each month, they asked for an abatement of 3 cents per 1,000 on printed cigarettes, and they made other demands for modifications of the regular terms. These frequent requests were most of them granted, and Hess & Co. accepted the concessions, and profited by them. This course of proceeding shows that Hess & Co. did not construe the terms "uniform" and "the same to all" as inexorably fixed rules of the Bonsack Company, and did not treat Strouse's language as other than an approximate statement of the terms on which the company rented their machines. Hess & Co. themselves, for two years and a half, put a construction upon the language of Strouse which conceded to the Bonsack Company the liberty of partially modifying their terms to suit the changing exigencies of business and the varying circumstances of their customers. Public pol-

icy requires that such correspondence as transpired between the parties to this suit should be construed in the interests of active trade, and with more or less liberality in favor of a free course of business in dealings of this character. In the case at bar the evidence shows that Hess & Co. did not act upon the rigid letter of Strouse's language. They frequently departed from it.

It is an essential ingredient of estoppel by conduct that the party claiming the benefit of this rule of law must have acted upon the declarations made to him by the defendant. In the leading case of Cornish v. Abington, 4 Hurl. & N. 549, the presiding justice said:

"The rule of estoppel is that, if a party [say the Bonsack Company] uses language which, in the ordinary course of business, and the general sense in which words are understood, conveys a certain meaning, he cannot afterwards say he is not bound, if another [say Hess & Co.], so understanding it, has acted upon it."

The conduct of Hess & Co. throughout their dealings with the Bonsack Company shows that they neither understood the language of Strouse in the rigid sense, nor acted upon it, in soliciting and accepting the different terms of which they were the beneficiaries. We do not think that the Bonsack Company, in a suit by Hess & Co., can be held to a rigid construction of the language which it employed in its letters of the 26th March and 25th April, 1887; Hess & Co. having themselves construed those letters liberally, in frequently requesting better terms for themselves, and receiving advantage of better terms accorded themselves in their own dealings with the Bonsack Company.

Coming now to the particular specifications of breaches of contract relied upon by Hess & Co., we find that their declaration singles out only two instances of such violations, to wit, the contracts with Duke & Sons and with the Lone Jack Company. Both of these contracts stipulated that the price required of the Lone Jack Company and of Duke & Sons, respectively, should be 30 and 33 cents per 1,000, and they stipulated additionally that part of this price—half in one case and a third in the other—should be credited to certain services defined in the contracts which the other parties to them agreed to render, respectively, in part payment of the regular charge of 30 and 33 cents per 1,000. If these services were real, valuable, and adequate, and if the parties were contracting in good faith, then, ex aequo et bono, in conscience and fair dealing, these contracts did not falsify the statement of Strouse in his letter of April 25, 1887, that his terms of payment were the same to all. Whether or not the services stipulated for in the contract were real, valuable, adequate, and agreed upon bona fide, was a question for the jury. Whether Strouse stated a moral and deceptive falsehood or merely a technical untruth in his letter of the 25th April, 1887, was also a question for a jury. The averment that these stipulations with the Dukes and the Lone Jack Company were for services not real, not adequate in value, nor made bona fide, and that the statement of Strouse that the royalties paid by these two companies were 30 and 33 cents per 1,000 was false and misleading, was a necessary one in the declaration filed in the suit. The

declaration itself put the bona fides of these stipulations and the truth of Strouse's statement directly in issue. Yet the defendant's evidence on neither one of these issues was allowed to go to the jury. The court below assumed that Strouse's statement was untrue, and refused to allow evidence to be given to the jury on the question of the value of the services and the bona fides of the stipulations relating to them in the contracts. It is needless for us to express any opinion on these two questions put in issue by the pleadings. We are of opinion that they were both questions for the jury, and that the court below erred in refusing to allow the defendant's evidence on them to go to the jury. Let it be observed that in his letters of the 26th March and the 25th April, 1887, Strouse, in detailing with precision the terms on which the Bonsack machines were let to cigarette manufacturers, did not include in his statement of these terms a clause declaring that the royalties specified should invariably be paid in cash. He did not preclude his company from the right, in particular instances, of accepting payment of the royalties, wholly or in part, in property of equivalent value. He virtually reserved that right. If, in a case we shall suppose, the maker of a valuable machine were in the habit of informing his customers that his price, say $100 each, was uniform and the same to all, and yet should accept a winter's supply of coal from one purchaser, worth at market rates $100, and should purchase a horse at $100 from another person to whom he sold a machine, and should allow his dry-goods merchant, whose bill was $100, to take another machine in payment of the debt, and should buy a carriage at $200, and ask a credit on the price of $100, from the carriage maker, in payment for a machine, taken by the latter, we do not think that these transactions would constitute a breach of his guaranty to the public that he charged $100 invariably for all his machines. We do not think that a suit at law could avail in any court to recover damages under such a guaranty. Yet the case supposed differs little from the two contracts under consideration. Confidence in trade and activity in business would be impaired by construing the guaranty in such a manner. Public policy would forbid so rigid a construction, for such transactions are of just the kind which most promote trade and facilitate business. This important question was one of the issues in the case,—indeed the most prominent one,—and important evidence, directly bearing upon it, was withheld from the jury; that evidence being the depositions of James B. Duke and William H. Butler, and the testimony proffered by defendant of Edmund Schaeffer, president of the Lone Jack Company, and Stewart Walker. We think the court below erred in excluding this evidence.

The exceptions taken at the trial by the defendants in the suit below are very numerous, and need not be considered in detail. They relate chiefly to the instructions prayed for respectively by counsel on either side. Those prayed for by counsel for the plaintiffs below were given to the jury, en bloc, by the court. They embody a theory of the case which we think was radically erroneous. They seem to lose sight of the proposition that a plaintiff must

recover on the strength and merits of his own case, and, if these are wanting, cannot recover exclusively on the weakness and demerits of the defendant's case. They virtually put to the jury the question of the defendant's delinquency, and no other. They embodied directions to the jury which excluded from their consideration important evidence which the defendant below offered in their favor. We think the court below erred in granting them in the form in which they were framed. The instructions prayed for by defendant's counsel contained propositions which we think ought to have been presented to the jury in some form or other. Some of the instructions were inadmissible, but we think several of them were proper. It is needless to discuss them in detail. Sufficient has been said to show that the judgment below must be reversed, and the verdict found for the plaintiffs below be set aside.