## SCOTT v. LATIMER.

(Circuit Court of Appeals, Eighth Circuit. October 3, 1898.)

No. 1,026.

1. NATIONAL BANKS—INCREASE OF CAPITAL STOCK—VALIDITY OF STOCK ISSUED.
Where the stockholders of a national bank decide, with the approval of the comptroller, to increase the capital stock therein by a named amount, the clause of Rev. St. § 5142, to the effect that no increase shall be valid until the whole amount is paid in, does not create a condition, express or implied, that shares subscribed and paid for in full are not to be held valid unless the entire amount of the proposed increase is subscribed and paid for in full, but refers only to the actual increase created by a subscription for a given number of shares, which must be paid up in full to render it valid. Under the amendatory act of May 1, 1886 (24 Stat. 18), the amount of the proposed increase decided upon and approved by the comptroller merely fixes the maximum increase authorized, and each subscription thereto, when paid up in full, becomes valid and binding until such maximum is reached. Sanborn, Circuit Judge, dissenting.

2. SAME—LIABILITY OF STOCKHOLDER—ASSESSMENTS AFTER INSOLVENCY.
The liability of a stockholder in a national bank for assessments made by the comptroller on its insolvency is not dependent upon the contract of subscription between the stockholder and the corporation, but is created by statute for the benefit of the bank's creditors, and can neither be modified nor released by any act of the corporation. Sanborn, Circuit Judge, dissenting.

3. SAME—SUBSCRIPTION VOIDABLE FOR FRAUD—RIGHTS OF CREDITORS.
A subscription to the stock of a national bank, though induced by false representations of its officers, is not void, but voidable only, at the election of the subscriber; and where he continues for years, and until the bank has been placed in liquidation, to remain and act as a stockholder, and to receive dividends as such, though without knowledge of the fraud, or means of ascertaining it, he cannot then exercise his option to rescind the contract of subscription as against the bank's creditors, whatever his rights might be as against the corporation. Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Missouri.

This action was brought in the United States circuit court for the Western district of Missouri, by W. A. Latimer, receiver of the First National Bank of Sedalia, to recover from George H. Scott an assessment made by the comptroller of the currency upon the capital stock of the named bank, it being claimed that Scott owned and held 50 shares of the stock. In the answer filed it was admitted that the bank had been duly incorporated in 1865; that it closed its doors and was put in liquidation in May, 1894, the plaintiff, Latimer, being appointed receiver on May 10, 1894; that the comptroller had determined that it was necessary to enforce the individual liability of the stockholders in favor of the creditors, and to that end had made an assessment of 75 per cent. upon the stock held in the bank, and that payment thereof had been demanded of the defendant, Scott. As matters of defense it was averred in the answer that on September 6, 1890, the bank, by a vote of the owners of two-thirds of the capital stock, voted to increase the capital from $100,000 to $250,000; that said bank notified the comptroller that the whole amount of said increase had been paid in, and on January 17, 1891, the comptroller, basing his action wholly upon the notification from the bank, issued his certificate, stating that the amount of the increase was $150,000, and that the same was paid in, and was approved by him as comptroller. It is further averred in September, 1890, the officers of the bank represented to the defendant, Scott, that the bank proposed to increase its capital stock by the addition thereto of $150,000; that this increase was made desirable on account of the increasing and flourishing condition of the business of the bank, which was earning large dividends, and had a surplus then earned which would make the shares, including the proposed increase, worth $108 per share; that, relying upon these representations, the defendant subscribed for 50 shares of the proposed increase, and in October, 1890, deposited in the bank the sum of $5,400, it being then and there the understanding between defendant and the bank that said sum, so deposited, was to be held by the bank, and applied in payment of defendant's subscription for 50 shares, when all the proposed increase was subscribed and paid for; that about October 25, 1890, the bank, with intent to deceive defendant, falsely represented that the whole amount of the proposed increase of the capital stock had been subscribed and paid in, and thereupon issued to defendant a certificate for the 50 shares of stock by him subscribed for; that defendant, relying upon these representations, accepted the certificate, and held and claimed the same as owner until after the closing of the bank, and in the years 1891 and 1892 received and retained alleged dividends amounting to 18 per cent.; that as a matter of fact in September, 1890, and for many months prior thereto and ever afterwards the bank was insolvent, its liabilities exceeding its assets; that only about two-thirds of the proposed increase of the capital stock was ever paid in; that the officers of the bank made false entries on the books for the purpose of showing an apparent surplus, and declared a dividend thereon, turning in the same in pretended payment of a large part of said increased stock; that the whole transaction was a sham and fraud, of which the defendant had no knowledge until after the bank closed its doors, in May, 1894; that the books of the bank were so kept that the defendant could not, by the utmost diligence, ascertain the true condition of the bank; and that, as soon as defendant discovered that the increase of stock was not fully paid in, he disclaimed that he was, or ever had been, a stockholder in the bank. Upon the filing of this answer, the plaintiff, Latimer, moved for judgment in his favor on the pleadings on the ground that the answer admitted all the facts necessary to sustain his action in the first instance, and that the matters set up as a defense were insufficient to defeat the claim sued on. The court held the motion to be well taken, and gave judgment accordingly, and thereupon the case was brought to this court by writ of error, it being contended by the plaintiff in error that the facts averred in the answer showed that there had not been a valid increase of the capital stock, because the whole amount of the proposed increase of $150,000 had not been paid in; and, further, that the facts

averred in the answer entitled the defendant, upon discovery thereof, to rescind the contract of subscription on the ground of false and fraudulent representations made to him by the officers of the bank.

H. F. Stevens (John D. O'Brien, Haydn S. Cole, and Armand Albrecht, on the brief), for plaintiff in error.

William S. Shirk, for defendant in error.

Before SANBORN and THAYER. Circuit Judges, and SHIRAS, District Judge.

SHIRAS, District Judge, after stating the case as above, delivered the opinion of the court.

From the foregoing statement of facts it appears that the plaintiff in error relies upon two distinct grounds of defense to the claim asserted by the receiver; the one being that the plaintiff in error never was a stockholder in the bank, because the whole amount of the proposed increase of the capital stock was not in fact paid in to the bank, and the other being that the plaintiff in error is entitled to rescind the contract by which he became a purchaser of stock in the bank for two reasons: First, because his subscription was conditioned upon the payment in full of all the proposed increase of stock; and, second, because he was induced to purchase the stock through fraudulent representations as to the pecuniary condition of the bank.

In support of the first defense it is contended that the 50 shares of stock subscribed for by the plaintiff in error were not valid shares, because some of the shares subscribed for by other parties were not in fact paid for. This contention is based upon the provisions of section 5142, Rev. St., which are as follows:

"Any association formed under this title may, by its articles of association, provide for an increase of its capital from time to time, as may be deemed expedient, subject to the limitations of this title. But the maximum of such increase to be provided in the articles of association, shall be determined by the comptroller of the currency; and no increase of capital shall be valid until the whole amount of such increase is paid in, and notice thereof has been transmitted to the comptroller of the currency, and his certificate obtained specifying the amount of such increase of capital stock, with his approval thereof, and that it has been duly paid in as part of the capital of such association."

The theory of the plaintiff in error is that under the provisions of this section no share of a proposed increase of the capital stock can become a valid share unless all the shares of the proposed increase are subscribed for and are paid up in full, or, in other words, if the shareholders should determine, with the approval of the comptroller of the currency, to increase the capital stock by the sum of $100,-000, or 1,000 shares of $100 each, and the entire number should be subscribed for, and all the shares except 1 should be fully paid for, and certificates should be duly issued therefor, the holders of such full-paid shares cannot be held to be stockholders, because another person has failed to pay up one share by him subscribed for. It cannot be denied that if the words, "and no increase of capital shall be valid until the whole amount of such increase is paid in," found in section 5142, are construed literally, support would be given to the contention of counsel for plaintiff in error; but it is an ac-

cepted and fundamental rule in the construction of statutes that the several clauses thereof are not to be viewed as separate enunciations of the legislative will, to be literally construed without reference to other parts of the act, but, on the contrary, each part must be construed with reference to the language and purpose of the entire act, so as to make all parts harmonize, and conduce to the carrying out the general purpose of the statute, and a literal construction of particular clauses will not be adopted if the effect thereof would be to operate unjustly or to cause an absurd result.

Thus, in U. S. v. Kirby, 7 Wall. 482, it is said:

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always therefore be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter."

In Heydenfeldt v. Mining Co., 93 U. S. 634, it was ruled:

"If a literal interpretation of any part of it would operate unjustly, or lead to absurd results, or be contrary to the evident meaning of the act taken as a whole, it should be rejected."

In Kohlsaat v. Murphy, 96 U. S. 153, it is declared that:

"In the exposition of statutes, the established rule is that the intention of the lawmaker is to be deduced from a view of the whole statute, and every material part of the same."

In Church of Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, it is said:

"It is a familiar rule that a thing may be within the letter of a statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has often been asserted, and the reports are full of cases illustrating its meaning."

Under the doctrine of these cases it is clear that in construing the particular clause of section 5142 which declares that no increase of the capital stock shall be valid until the whole amount of the increase shall have been paid in, we must regard not only the words of the special clause, but also the other provisions of the entire act, and the effect which a given construction will have upon the admitted or undoubted purposes of the statute as a whole. Turning to section 5140, we find it therein declared that in the original organization of national banks at least 50 per cent. of the capital stock must be paid in before the bank is authorized to commence business, the remaining 50 per cent. being payable in installments of at least 10 per cent., payable at the end of each month succeeding to the date when it is authorized to commence business. The provisions of this section make it imperative that within six months from the time when the bank begins business each share must be paid in full. If, after the original stock has been paid in, it is deemed advisable to increase the capital stock, provision is made therefor in section 5142, as amended by section 1 of the act of May 1, 1886 (24 Stat. 18). If it were permitted, for the purpose of increasing the capital stock, to issue shares without requiring the same to be fully paid up, two evil results would follow. So far as the public are interested, the·

bank would be doing business on an apparent capital, which, in fact, it did not possess; or, in other words, the capital stock would be watered, and, so far as the holders of the original full-paid stock are concerned, the new stock, though only partly paid for, would stand on an equality with the full-paid stock, both as to voting power and right to draw dividends, which would be manifestly unjust. These are the evils intended to be prevented by enacting that, when an increase of the capital should be made, the increase should not become valid unless the whole amount thereof should be paid. The statute does not require that the proposed increase shall be subscribed by one person, or at one time, but it is permissible to have as many subscribers as there are new shares. Let it be assumed that the stockholders of a national bank, by a two-thirds vote, should determine to add $100,000 to the capital stock, and should obtain in a month a subscription for $25,000,—that is, for 250 shares,—and the full par value thereof should be paid in, and this increase should be reported to the comptroller, and be by him approved, and certificates should then be issued to the subscribers, would not the holders of these certificates, from that time forward, be stockholders, even though the remaining part of the voted increase never was subscribed for? Could the bank, after receiving the money for the shares, with the approval of the comptroller, be permitted to deny to the subscribers the rights of stockholders, simply because the full amount of the proposed increase had not been obtained? In Aspinwall v. Butler, 133 U. S. 595, 10 Sup. Ct. 417, this general question was considered, it appearing in that case that on September 13, 1881, it had been voted to increase the stock of the Pacific National Bank from $500,000 to $1,000,000; that Aspinwall became a subscriber for 50 shares of this proposed increase, and on October 1, 1881, he paid to the bank the sum of $5,000, being the face amount of the 50 shares. Subscriptions for the proposed increase of $500,000 were not procured, and on December 13, 1881, the directors adopted a resolution reciting the failure to obtain subscriptions for $38,700 of the proposed increase, that the shares subscribed for and paid up amounted to $461,300, and directing notice to be sent to the comptroller that the capital had been increased by the last-named sum. The comptroller issued a certificate under date of December 13, 1881, to the effect that the capital stock of the bank had been increased in the sum of $461,300. Shortly afterwards the bank closed its doors, an assessment of 100 per cent. was made by the comptroller, and it was held by the supreme court that Aspinwall was liable as a stockholder for the assessment on the 50 shares subscribed and paid for by him, although the original proposed increase of $500,000 was not obtained, and although it appeared that Aspinwall did not know of the action of the directors in reducing the proposed increase to $461,-300. In construing the clause of section 5142 that declares that no increase shall be valid until the whole amount of the increase is paid in, the supreme court held that:

"The clause in question was intended to secure the actual payment of the stock subscribed, and so to prevent what is called watering of stock. The argument of the defendant asks too much. It would apply to the original

capital of a company as well as to an increase of capital. And will it do to say, after a company has been organized and gone into business, and dealt with the public, that its stockholders may withdraw their capital, and be exempt from statutory liability to creditors, if they can show that the capital stock of the company was not all subscribed?"

The contention of counsel for plaintiff in error upon this point is that the clause found in section 5142, requiring the whole increase to be paid in full, is a condition affecting the subscription of each subscriber to the proposed increase, so as to make it conditional, and not effective, unless the entire amount of the proposed increase is subscribed and paid for; yet in Aspinwall v. Butler (page 607, 133 U. S., and page 421, 10 Sup. Ct.), in considering this exact question, the supreme court said:

"There was no express condition that the individual subscription should be void if the whole $500,000 was not subscribed; and, in our judgment, there was no implied condition in law to that effect."

In Thayer v. Butler, 141 U. S. 234, 11 Sup. Ct. 987, a subscriber to 40 shares of the increased capital of the Pacific National Bank, when sued for the assessment thereon, asked the trial court "to rule and hold the law to be as stated in the opinion of the supreme court of Massachusetts in Eaton v. Bank, reported in 144 Mass. 260, 10 N. E. 844, and to rule and hold that the vote of the directors of September 13, 1881, was in the nature of a proposition to stockholders to subscribe for 5,000 shares of new stock, and to pay in for it $500,000; that it was necessary that the stock should all be taken, and the money paid in, before the new stock could be created; and that it was a condition precedent to the issue of the new stock under this vote that both these things should be done, and that the comptroller should certify that they had been done, and approve the increase; and that the defendant paid the money to the bank on September 28, 1881, upon the implied condition that he should not be required to take new stock unless the proposed amount of 5,000 shares was created; and, as this was not done, the defendant did not become a shareholder in respect of the 40 shares for which he paid September 28, 1881, and for the assessment upon which the plaintiff seeks to recover." The trial court refused to so hold and rule, and the supreme court declared that: "We are of opinion that the decision of the circuit court was correct, and that there is no error in the record."

The conclusion deducible from these decisions of the supreme court is that in cases wherein the stockholders of a national bank decide, with the approval of the comptroller, to increase the capital stock therein by the addition of a named amount, the clause found in section 5142 of the Revised Statutes, to the effect that no increase shall be valid until the whole amount thereof is paid in, does not create a condition, express or implied, that shares subscribed and paid for in full are not to be held valid unless the entire amount of the proposed increase is subscribed and paid for in full. In Delano v. Butler, 118 U. S. 634, 7 Sup. Ct. 39, and in McFarlin v. Bank, 16 C. C. A. 46, 68 Fed. 868, it is said:

"Three things must concur to constitute a valid increase of the capital stock of a national banking association: First, that the association, in the mode pointed out in its articles, and not in excess of the maximum prescribed fo.

by them, shall assent to an increased amount; that the whole amount of the proposed increase shall be paid in as part of the capital of such association; and, third, that the comptroller of the currency, by his certificate specifying the amount of such increase of capital stock, shall approve thereof, and certify to the fact of its payment."

In thus defining the essentials to a valid increase of the capital stock of a national bank the supreme court, in Delano v. Butler, and this court in McFarlin v. Bank, make use of the words found in section 5142, to the effect that, to be valid, the whole amount of the proposed increase must be paid; but in construing the meaning of the clause in question, thus quoted, we must follow the construction placed thereon by the supreme court in the subsequent cases of Aspinwall v. Butler, 133 U. S. 595, 10 Sup. Ct. 417, Bank v. Eaton, 141 U. S. 227, 11 Sup. Ct. 984, and Thayer v. Butler, 141 U. S. 234, 11 Sup. Ct. 987, in all of which cases it was held, as already stated, that the clause in question did not import into the stock subscriptions a condition, either express or implied, to the effect that the validity of the shares that were in fact subscribed and paid for in full was dependent on the question whether the whole of the proposed increase was subscribed and paid for. In the answer filed in this case it is averred that on September 6, 1890, the First National Bank of Sedalia, Mo., by a vote of the owners of two-thirds of the capital stock, voted to increase the capital of the bank by the addition thereto of the sum of $150,000; that subsequently the bank notified the comptroller that the whole amount of this increase had been paid in; that thereupon the comptroller, on the 17th of January, 1891, issued his certificate, stating therein that the capital of the bank was increased in the sum of $150,000, the whole of the increase being paid in, and that the increase of the capital stock was approved. It is also averred that the plaintiff in error, in October, 1890, subscribed for 50 shares of the proposed increase, and paid to the bank the sum of $5,400, and received, on or about October 25th, from the bank, a certificate showing him to be the owner of the 50 shares. It is also averred that in fact only about two-thirds of the proposed increase was ever paid in, and, relying on this averment that about one-third of the proposed increase had not been paid for, the claim is made that the shares which were subscribed and paid for in full, and for which certificates were duly issued, cannot now be held to be valid. If this contention is well founded, then, as already said, it follows that, if all the shares but one had been subscribed and paid for, nevertheless the holders of the certificates for the full-paid shares could not be heard to assert that they were the owners of valid shares, which would be a most unjust result. If this is the true meaning of the statute, it is made possible for parties in control of a national bank, with the approval of the comptroller, to authorize the increase of the capital stock, to obtain subscription and payment in full for all the shares but one or two, and then, if that be desirable, to deny to the holders of these full-paid certificates any participation in the control of the bank, or, in case the bank becomes insolvent, to shield these holders of certificates from liability to creditors. Certainly, a construction of the statute having such results should

89 F.—54

not be adopted unless the statute as a whole imperatively demands it. According to the provisions of section 5142 as originally adopted, the articles of association of each bank might provide for an increase of the capital stock, the maximum of such increase in each case to be determined by the comptroller, and named in the articles. By section 1 of the amendatory act of May 1, 1886 (24 Stat. 18), it is declared:

"That any national banking association may, with the approval of the comptroller of the currency, by the vote of shareholders owning two-thirds of the stock of such association, increase its capital stock in accordance with existing laws, to any sum approved by the said comptroller, notwithstanding the limit fixed in its original articles of association and determined by said comptroller."

Under this amendatory statute, the maximum of increase is not the sum named in the articles of association, but repeated increases may be made from time to time by affirmative vote of the holders of two-thirds of the capital stock, approved by the comptroller. Thus, in a given instance, the vote of the requisite number of shareholders, approved by the comptroller, to increase the capital stock by the addition of $100,000, makes that amount for the time being the maximum of the increase that can be lawfully made, and of necessity it authorizes the addition of sums less than the maximum. Such action, taken under the provisions of the amendatory act of 1886, means that the shareholders, by a proper vote, have authorized the increase of the capital stock by amounts not exceeding in the aggregate the maximum sum of $100,000, and that the comptroller has approved such action. Each subscription for portions of such increase, when paid up in full, becomes valid and binding until the maximum is reached; and the statute does not incorporate into such subscriptions a condition that the subscriber, paying his subscription in full, cannot become a holder of valid stock unless the maximum amount of the proposed increase is subscribed and paid for. The action of the stockholders in voting to increase the capital stock by a given sum, though approved by the comptroller, does not, in any sense, increase the capital stock. It authorizes an increase, but does not make it. The increase is created by the procurement of subscriptions to the capital stock, the payment of each subscription in full, and the issuance of the comptroller's certificate under the provisions of section 5142.

The clause providing that no increase shall be valid until the whole amount of such increase is paid in does not refer to the maximum amount of the authorized increase, but to the actual increase created by a subscription for a given number of shares. To make the subscription valid, this clause requires that it shall be paid in full, the object being to prevent the issuance of shares which are only partly paid up; but it does not require, in order that validity may exist with respect to shares subscribed for and paid up in full, that the whole amount of the authorized increase should be subscribed and paid for. To so hold would be to rule directly contrary to the supreme court in Aspinwall v. Butler and Thayer v. Butler, supra, wherein it was held that the statute did not create a condition in each subscription

to the stock, that the same should not become effectual unless the entire proposed increase was subscribed and paid in; and it therefore follows that, if it be true that only two-thirds of the proposed increase of the capital stock was subscribed and paid for, as is claimed in the answer, that fact would not invalidate the shares subscribed and paid for in full and for which certificates were issued to and received by the subscribers and under which they exercised the privileges and received the benefits of shareholders for a period of over three years.

The remaining grounds of defense relied on by plaintiff in error are based upon the assumed right to rescind the contract of subscription to the capital stock of the bank on the ground that such subscription was procured through false representations made to plaintiff in error touching the actual pecuniary condition of the bank, and to avoid the effect of the acceptance by the plaintiff in error of the shares of stock issued to him on the ground that it was falsely represented to him that the whole amount of the proposed increase of $150,000 had been paid in. It will be borne in mind that this is not an action on behalf of the bank, based upon the original contract of subscription, but it is a suit wherein the creditors of the bank, represented by the receiver, are seeking to enforce the liability which the statute imposes upon those who occupy the position of stockholders in a national bank; and the question is whether it is open to the plaintiff in error, after the bank has become insolvent, and has been put into liquidation, to disclaim liability as a stockholder after having occupied that position for nearly four years. This general question was considered by this court in the case of Bank v. Newbegin, 74 Fed. 135, 20 C. C. A. 339, and, after a consideration of the leading cases dealing with the subject, the conclusion reached was stated as follows:

"There are obvious reasons why a shareholder of a corporation should not be released from his subscription to its capital stock after the insolvency of the company, and particularly after a proceeding has been inaugurated to liquidate its affairs, unless the case is one in which the stockholder has exercised due diligence, and in which no facts exist upon which corporate creditors can reasonably predicate an estoppel. When a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, upon one pretense or another, and to assume the role of creditor, is very strong, and all attempts of that kind should be viewed with suspicion. If a considerable period of time has elapsed since the subscription was made; if the subscriber has actively participated in the management of the affairs of the corporation; if there has been any want of diligence on the part of the stockholder, either in discovering the alleged fraud, or in taking steps to rescind when the fraud was discovered; and, above all, if any considerable amount of corporate indebtedness has been created since the subscription was made, which is outstanding and unpaid,—in all of these cases the right to rescind should be denied, where the attempt is not made until the corporation becomes insolvent. But, if none of these conditions exist, and the proof of the alleged fraud is clear, we think that a stockholder should be permitted to rescind his subscription, as well after as before the company ceases to be a going concern."

As already stated, the answer herein filed admits that the plaintiff in error in fact became a subscriber for 50 shares of the stock in September, 1890; that he paid in to the bank the full value thereof,

and received the certificate issued therefor; that he received all the dividends declared thereon; and that when the bank closed its doors and was put in liquidation, in May, 1894, he had not taken any action indicating a purpose to disclaim being a stockholder in the association. Even if the situation is such that there exists a right of rescission as against the bank, such right cannot be asserted as against the creditors. If it be true that the subscription to the stock was obtained by false representations touching the pecuniary condition of the bank, that did not make the contract absolutely void, but only voidable at the option of the subscriber; and therefore, when the bank was put in liquidation, the corporate creditors had the right to enforce the statutory liability against all persons who were then stockholders. It is settled that if one knowingly permits his name to appear on the books of a national bank as a shareholder, and accepts the benefits of the position, he will be held liable to the responsibilities thereof in favor of creditors whose rights have intervened during the time his name thus appears as a stockholder. Chubb v. Upton, 95 U. S. 665; Keyser v. Hitz, 133 U. S. 138, 10 Sup. Ct. 290; Veeder v. Mudgett, 95 N. Y. 295; Stutz v. Handley, 41 Fed. 531; Pauly v. Trust Co., 165 U. S. 606, 17 Sup. Ct. 465. Suits of this character, strictly speaking, are not actions based upon the contract of subscription existing between the corporation and the stockholder. The right of the creditors to enforce the statutory liability against shareholders in a national bank is not dependent upon the terms of the stock-subscription contract. Thus, in Scovill v. Thayer, 105 U. S. 143, it is said:

"The stock held by the defendant was evidenced by certificates of full-paid shares. It is conceded to have been the contract between him and the company that he should never be called upon to pay any further assessments upon it. The same contract was made with all the other shareholders, and the fact was known to all. As between them and the company, this was a perfectly valid agreement. It was not forbidden by the charter, or by any law or public policy, and, as between the company and the stockholders, was just as binding as if it had been expressly authorized by the charter. * * * But the doctrine of this court is that such a contract, though binding on the company, is a fraud in law on its creditors, which they can set aside; that when their rights intervene, and their claims are to be satisfied, the stockholders can be required to pay their stock in full. Sawyer v. Hoag, 17 Wall. 610; New Albany v. Burke, 11 Wall. 96; Burke v. Smith, 16 Wall. 390. The reason is that the stock subscribed is considered in equity as a trust fund for the payment of creditors. Wood v. Dummer, 3 Mason, 308, Fed. Cas. No. 17,944; Mumma v. Potomac Co., 8 Pet. 281; Ogilvie v. Insurance Co., 22 How. 387; Sawyer v. Hoag, supra. It is so held out to the public, who have no means of knowing the private contracts made between the corporation and its stockholders."

The liability sought to be enforced in this case is not one created by a contract existing between the corporation and the stockholders, but is one created by statute in favor of creditors, and not in favor of the corporation. It is a liability which cannot be affected, discharged, or released by any action taken by the corporation, or by the combined action or agreement of the corporation and its stockholders. Thus, in Delano v. Butler, 118 U. S. 634, 7 Sup. Ct. 39, it appeared that the stockholders, in order to meet the liabilities of the bank, had made an assessment of 100 per cent. upon the capital

stock which was paid in, but the bank was ultimately compelled to go into liquidation, and the comptroller made an assessment upon the stockholders under the provisions of section 5151 of the Revised Statutes. The supreme court held that the payment of the assessment made by the stockholders did not relieve them from liability for the assessment made by the comptroller, it being said that:

"Under section 5151 the individual liability does not arise, except in case of liquidation and for the purpose of winding up the affairs of the bank. The assessment under that section is made by the authority of the comptroller of the currency, is not voluntary, and can be applied only to the satisfaction of the creditors equally and ratably."

It is thus made clear that the liability sought to be enforced in this case is not dependent upon the terms, or in fact upon the existence, of a contract of subscription to the capital stock of the bank, but it is a liability imposed by statute in favor of creditors, and it is a liability, as already said, which cannot be modified or released by any action on part of the corporation or of the corporation and its stockholders. It is created for the benefit of the creditors, and no action on part of the bank can estop the creditors from enforcing their rights in this particular. Upon whom does the statute impose the liability? In Bank v. Case, 99 U. S. 628, and Bowden v. Johnson, 107 U. S. 251, 2 Sup. Ct. 246, it was ruled that the actual or beneficial owner of the stock would be liable, and that this liability could not be evaded by the device of transferring the title to a third person, who might be financially irresponsible. In Pauly v. Trust Co., 165 U. S. 606, 17 Sup. Ct. 465, it is said:

"It is true that one who does not, in fact, invest his money in such shares, but who, although receiving them simply as collateral security for debts or obligations, holds himself out on the books of the association as true owner, may be treated as the owner, and therefore liable to assessment, when the association becomes insolvent, and goes into the hands of a receiver. But this is on the ground that, by allowing his name to appear upon the stock list as owner, he represents that he is such owner; and he will not be permitted, after the bank fails, and when an assessment is made, to assume any other position as against creditors. If, as between creditors and the person assessed, the latter is not bound by that representation, the list of shareholders required to be kept for the inspection of creditors and others would lose most of its value. * * * As already indicated, those may be treated as shareholders, within the meaning of section 5151, who are the real owners of the stock, or who hold themselves out, or allow themselves to be held out, as owners, in such way and under such circumstances as, upon principles of fair dealing, will estop them, as against creditors, from claiming that they were not in fact owners."

In the answer filed in this case it is admitted that the plaintiff in error subscribed for 50 shares of stock, accepted the certificate issued therefor, received the dividends paid thereon, and thus for nearly four years appeared as a stockholder on the books of the bank; and certainly these facts entitle the creditors to enforce, as against the plaintiff in error, the liability which the statute imposes upon those persons who allow themselves to be held out as owners of the capital stock of a banking association. To escape this liability, the plaintiff in error pleads that he was induced to become a stockholder in the bank by reason of certain false representations made to him by the officers of the bank with respect to the financial condition of the

association, which were of such a character that he is now entitled to rescind the contract of subscription.     Granting it to be true that, if a suit were now brought by the bank, or on its behalf, to enforce the contract of subscription against the plaintiff in error, he might successfully defend the action on the ground that he had been induced to enter into the contract by false representations on part of the bank, does it follow that this defense is available against the present action? This suit is not in favor of the bank, but is on behalf of the creditors, and is not to enforce any provision of the contract of subscription existing between the bank and the plaintiff in error, but is based upon the liability imposed by the statute, in favor of creditors, against those who knowingly assume the position of stockholders, and which may exist, although no contract of subscription was ever entered into between the bank and the holder of the capital shares.     Even as between the bank and the plaintiff in error the contract of subscription was not void.     It may have been voidable at the option of the plaintiff in error, but, until so avoided, it remained in force.     When the bank closed its doors, and was put in liquidation, the plaintiff in error was in fact a shareholder, and so appeared upon the books of the association.     While it may be true that his subscription to the capital stock had been obtained under such circumstances that he might, at his option, rescind the same, yet he had not done so when the bank failed, and, although he may not be chargeable with negligence in not earlier discovering the falsity of the representations made to him by the officers of the bank, yet the fact remains that when the association was put in liquidation, and when the rights of the creditors became fixed, he not only appeared upon the books of the bank as the owner of 50 shares of the capital stock, but in truth he had for nearly four years held the certificate issued therefor, had received the dividends declared, and had exercised all the rights of a shareholder.

These facts clearly bring the plaintiff in error within the liability imposed by the statute upon those who assume the appearance of stockholders in a national bank, and the liability thus created cannot be defeated by showing that the plaintiff in error was induced to accept the position of stockholder by false representations made by the officers of the bank.     These officers do not represent the creditors, nor· can the latter be made responsible for their acts.     If A., being the owner of 50 shares of the capital stock in a bank, should induce B. to purchase the same through false representations with respect to the financial condition of the bank, the stock being transferred to B. on the books of the association, could B., if the bank subsequently failed, escape liability to the creditors on the ground that he had been induced to purchase the stock through the false representations made by A.?     If, under these circumstances, A. should sue B. to enforce payment for the stock, it would be open to B. to defeat the action by proof of the fraud, and it would be open to B. to sue A. for the damages caused him by the deceit practiced on him, but it certainly would not be open to B. to defeat the liability created by the statute in favor of creditors as against the shareholders by showing that he had been induced to purchase the stock by the false representations

made by A. Does it make any difference in the result to show that A. was an officer in the bank for whose acts or representations the association might be made responsible? If it be the law, as it is declared to be by the supreme court in Scovill v. Thayer, supra, that the bank cannot, by any contract it may make with the subscribers to its capital stock, relieve the latter from the statutory liability created in favor of creditors, how can it be held that this liability can be defeated by representations made by the bank or its officers? Admitting to the fullest extent that the representations made to the plaintiff in error by the officials of the bank were such that, upon the discovery thereof, he would have the right to rescind the contract of subscription, yet it must be true that, until he exercised the right of rescission, he would, as to creditors, be in fact a stockholder. The answer admits that when the bank was put in liquidation the plaintiff in error had not rescinded the contract of subscription, and nothing he could thereafter do would defeat the rights of the creditors, which must be measured by the condition of affairs existing when liquidation was entered upon. It is admitted in the answer that from October, 1890, until in May, 1894, the plaintiff in error held the certificate of stock issued to him for 50 shares, claiming the same as owner, and that he received the dividends paid in the years 1891 and 1892. These acts of the plaintiff in error the creditors had an absolute right to rely upon, as evidencing the fact that during that period of time he was a shareholder in the bank; and it is not now open to the plaintiff in error, by asserting or exercising the right of rescission which may exist between himself and the bank, to defeat the right of the creditors, which is based upon the liability which the statute imposes upon all persons who allow themselves to be held out as shareholders in a national bank. As already said, this suit is not based upon the contract of subscription between the bank and the plaintiff in error, and is not, therefore, an action wherein the issue can be made as to the voidability of that contract as between the bank and the shareholders. The suit is on behalf of the creditors, to enforce a statutory liability in which the bank has no interest; a liability which was not created by any contract to which the bank was a party; a liability which it is beyond the power of the bank to modify, release, or discharge; and a liability which, if once called into existence by the act of one assuming the position of a stockholder, cannot be defeated save by the creditors, or by some one acting in their behalf. Potts v. Wallace, 146 U. S. 689–703, 13 Sup. Ct. 196. The law presumes that the creditors of a corporation become, and continue to remain, such, in reliance upon the liability imposed upon the stockholders by statute; and it would be a fraud upon the creditors to permit one who has for years occupied the position of a stockholder, and has received the benefits thereof, to repudiate liability to the creditors on the ground that, as between himself and the corporation, his contract of subscription to the capital stock was one voidable at his option. In cases like the present, wherein it appears that for years a person has actually sustained the relation of a stockholder in a banking association, although under circumstances which may justify a rescission of the contract of stock subscription, as between

the subscriber and the corporation, the just protection of creditors whose rights have intervened during this period requires it to be held that, as against creditors, the one who held the position of stockholder cannot escape the statutory liability by rescinding the subscription contract after the bank has been put into liquidation. The judgment of the circuit court is therefore affirmed.

SANBORN, Circuit Judge (dissenting). There are two reasons why I am unable to assent to the views expressed and the conclusion reached by the majority of the court in this case. They are that, in my opinion, the fraudulent representations which induced the plaintiff in error to contract for the purchase of his stock entitle him to repudiate that purchase, and to rescind his contract, and that the pretended increase of the capital of the bank was invalid, and he never became liable as a stockholder, because only two-thirds of the whole amount of the increase was ever paid in. Rev. St. § 5142. The case made by the pleadings is this: In 1890 the plaintiff in error was a stranger to the bank, free from all connection with or relation to it, and ignorant of its financial standing and character. The bank was insolvent, was earning no dividends, and had no surplus. To induce the plaintiff in error to purchase some shares of a proposed increase of its worthless stock, the bank falsely represented to him that it was solvent, and in a flourishing condition; that it was earning dividends on its stock; that it had a surplus of $50,000 above its capital stock and liabilities; and that its stock was worth a premium of $8 per share. By these misrepresentations it induced him to subscribe for 50 of the 1,500 shares it proposed to issue, and to deposit with it $5,400 under an understanding that this money should be applied to the payment for this stock when the whole amount of the increase of stock was subscribed for and paid in. The entire amount was subscribed for, but only two-thirds of this increase was ever paid in. The bank then appropriated the plaintiff's $5,400 in payment for the 50 shares of stock, sent him a certificate of it, and induced him to play the role of a stockholder by the false representation that the entire increase had been paid in, and by the same false representation induced the comptroller of the currency to issue his certificate, and approve the increase. At the same time it so falsified its books that the plaintiff in error could not, by the utmost diligence, learn the true condition of the bank. All this was done in October, 1890. But the bank continued to falsify its books, and to conceal the truth, so that the plaintiff in error had no suspicion of the fraud, and could not discover it by any reasonable diligence until after he had received two dividends on his supposed stock, and the bank had closed its doors in 1894. Here is a case where a bank, by the grossest false representations, has induced a stranger to pay $5,400, and to incur a liability for $5,400 more, for a certificate of worthless stock that furnished no consideration for the contract. It is difficult to conceive of a grosser fraud. Upon every principle of equity and justice this subscriber was entitled to repudiate this purchase, to rescind his contract, and to recover back his money, as soon as he discov-

ered the facts. Contracts for stock in a corporation which are induced by fraud create no obligation, and the victim of the fraud has the right to their abrogation. Vreeland v. Stone Co., 29 N. J. Eq. 190; Thomp. Liab. Stockh. § 142. It is true that this contract was voidable, and not void, and that the duty to rescind it as soon as the facts were discovered, or as soon as they could be discovered with reasonable diligence, was imposed upon this subscriber. But he avers in his answer—and this allegation stands admitted in this record—that the bank systematically, skillfully, and cunningly falsified its books, concealed the facts, and continued its false representations until it closed, in May, 1894, so that he could not, with the utmost diligence, discover the fraud, and so that he had no suspicion of it. How can he be said to be guilty of such negligence or laches as will deprive him of relief in the face of these facts? The statutes of the state of Missouri, where this fraud was perpetrated, provide that an action for relief on the ground of fraud may be brought at any time within five years after the discovery by the aggrieved party, within ten years, of the facts constituting the fraud (Rev. St. Mo. 1889, § 6775); and it is a familiar maxim that no time runs against the victim of a fraud while its perpetrator fraudulently and successfully conceals it (Scheftel v. Hays, 58 Fed. 457, 460, 7 C. C. A. 308, 312, and 19 U. S. App. 220, 226; Kelley v. Boettcher, 29 C. C. A. 14, 85 Fed. 55, 63). I am unable to escape the conviction that under this state of facts this subscriber was entitled to rescind the purchase of, and to repudiate the liability upon, his stock.

It is conceded in the opinion of the majority that, as against the bank, the plaintiff in error would be entitled to this relief; but it is insisted that by his delay in seeking it, and by his receipt of two dividends, he is estopped from obtaining it as against the receiver, because the latter represents the creditors of the bank as well as the bank itself. In support of this view, the cases of Chubb v. Upton, 95 U. S. 665; Veeder v. Mudgett, 95 N. Y. 295; Stutz v. Handley, 41 Fed. 531; Pauly v. Trust Co., 165 U. S. 606, 17 Sup. Ct. 465; and Keyser v. Hitz, 133 U. S. 138, 10 Sup. Ct. 290,—are cited. But there seems to me to be a radical difference between the standing of the subscriber in this case and that of the subscribers in Chubb v. Upton, Keyser v. Hitz, Upton v. Tribilcock, 91 U. S. 45, Sanger v. Upton, Id. 56, 63, and other cases of that class. In this case the plaintiff in error was induced to purchase by a gross and continuing fraud, which kept him in ignorance of the facts, and rendered it impossible for him to discover them by the use of reasonable diligence. In those cases the subscriptions were not induced by fraudulent, continued, and successful misrepresentations and concealments of material facts which lulled suspicion, and hid the truth, but the defenses were the defective exercise of the power to issue stock, as in Chubb v. Upton; the defective transfer of stock, as in Keyser v. Hitz and Sanger v. Upton, 91 U. S. 63; a misrepresentation as to the legal effect of the stock certificate, which purported to be nonassessable, which was held to be a misrepresentation of a matter of law, and unavailable, as in Upton v. Tribilcock, Id. 45, 50; the fact that an increase of stock was irregularly, but not fraudulently, issued, and

knowingly retained, as in Veeder v. Mudgett, 95 N. Y. 295, 310, and Stutz v. Handley, 41 Fed. 531; that subscribers or pledgees knowingly held themselves out as owners of stock "in such way and under such circumstances as upon principles of fair dealing will estop them as against creditors from claiming that they were not in fact owners," as was said in speaking of supposed cases in Pauly v. Trust Co., 165 U. S. 606, 623, 17 Sup. Ct. 465; and that subscriptions were knowingly ratified and adopted after full knowledge of the falsity of the statements which induced them, as in Ogilvie v. Insurance Co., 22 How. 380, 390. In these cases the subscribers or holders were held to be estopped as against the creditors, because they continued to act as stockholders after they knew, or, by the exercise of reasonable diligence, might have known, the facts. None of them were tricked into the place of stockholders and retained there by a continued fraud, which kept them in ignorance of, and rendered it impossible for them to learn, the truth by the exercise of reasonable diligence, as the plaintiff in error was in the case at bar. This is the radical distinction between the cases referred to and that in hand. It separates by as wide a difference the cases of Scovill v. Thayer, 105 U. S. 143; Sawyer v. Hoag, 17 Wall. 610; New Albany v. Burke, 11 Wall. 96; Burke v. Smith, 16 Wall. 390; Mumma v. Potomac Co., 8 Pet. 281; Delano v. Butler, 118 U. S. 634, 7 Sup. Ct. 39; Bank v. Case, 99 U. S. 628; Bowden v. Johnson, 107 U. S. 251, 2 Sup. Ct. 246; and Potts v. Wallace, 146 U. S. 689, 703, 13 Sup. Ct. 196,—cited in the opinion of the majority. It is held in those cases that those who knowingly permit themselves in various ways to appear to be stockholders, those who were stockholders, but presented the false appearance that they were not, and those who fraudulently transferred their stock to irresponsible parties to escape liability, were estopped from defeating creditors of the corporation in their attempts to hold them as such. It is, indeed, repeatedly said in those cases that the property of an insolvent corporation and the liability of the stockholder are a trust fund pledged for the benefit of the creditors; and that is equally true of every insolvent person. But in none of these cases—in no case cited by the court or the counsel— was the holder of the stock duped into his place and liability by undiscoverable fraud. In none of them did any court hold that money obtained from, or liability imposed upon, a stockholder by fraud which he could not discover, was a trust fund held for the benefit of the creditors of the corporation which perpetrated the fraud. Can a debtor by fraud confer upon his creditors any greater right to the property or liability of his victim than he gets himself? In the opinion of the majority this question is propounded: "If A., being the owner of fifty shares of the capital stock in a bank, should induce B. to purchase the same through false representations with respect to the financial condition of the bank, the stock being transferred to B. on the books of the association, could B., if the bank subsequently failed, escape liability to the creditors on the ground that he had been induced to purchase the stock through the false representations made by A.?" In my opinion, in the absence of other proof of an estoppel in pais, the question should be answered in the

affirmative, because fraud avoids every purchase, every sale, every contract, as against every one but an innocent purchaser or creditor who has taken his place in reliance upon it. That, however, is not the question in this case. The question here is: Could the assignee or receiver of B.'s property, in the case of the sale supposed, enforce a nonnegotiable obligation of A., which B. had induced him to make by the fraudulent representations? Regarding the answer to this question, it seems to me, there ought not to be two opinions. If a debtor procures goods by false representations, the rights of the defrauded vendor to recover them are always superior to those of the creditors of the vendee or the receiver who represents them. A fortiori, if, by the fraudulent representations, by which he sells his goods, he procures an assumption of liability by the vendee, the right of the latter to a rescission of the sale and a cancellation of the obligation is superior to the rights of either the vendor's creditors or his receiver to enforce it. Beach, Rec. § 704; Bank v. Peck, 29 Conn. 384, 386; Bussing v. Rice, 2 Cush. 48; Rohrbough v. Leopold, 68 Tex. 254, 258, 4 S. W. 460; Root v. French, 13 Wend. 570, 573; Barnard v. Campbell, 58 N. Y. 73; Slagle v. Goodnow, 45 Minn. 531, 48 N. W. 402; Starch Factory v. Lendrum, 57 Iowa, 573, 10 N. W. 900, and cases there cited; Atwood v. Dearborn, 1 Allen, 483; Devoe v. Brandt, 53 N. Y. 462, 465; Benj. Sales, § 433, note I. Why is not the right of one who is induced by the fraudulent representations of a bank to buy its stock to a rescission of that sale and a release of the liability it imposes superior to the claims of its creditors or its receiver to enforce them? Fraud vitiates every contract based upon it. A contract of subscription for or purchase of stock is no exception to the rule, and the relation and liability of a stockholder cannot exist without the existence, or an estoppel from denying the existence, of the contract of subscription or purchase. It is true, as is shown in Scovill v. Thayer, and other cases cited, that the stockholders' liability and the maintenance of the action upon it is not dependent upon the terms of the contract of subscription where those terms are in conflict with the law or the statute, as was the contract that the stock was nonassessable, but the existence of a valid contract of subscription or an estoppel from denying its existence is a sine qua non to the existence of the liability and the maintenance of the action. Without it there can be no stockholder, and hence no liability of a stockholder. And, where the contract is induced by fraud, and is rescinded without negligence or delay as soon as the facts constituting it are discovered, it is as though it had not been, and there remains neither contract nor stockholder, nor liability of a stockholder. In all the cases that have been cited in which the liability was enforced a contract of subscription or purchase which had not been induced by fraud, or which had been ratified after its discovery, existed, and the stockholders in those cases were held because, as was well said in Pauly v. Trust Co., 165 U. S. 606, 623, 17 Sup. Ct. 465, they were the real owners of the stock, or held themselves out, or "allowed themselves to be held out, as owners in such way and under such circumstances as, upon principles of fair dealing, will estop them, as against creditors, from claiming that they were

not, in fact, owners." But one who is induced by a continuing fraud to subscribe for or to purchase and to retain stock is not estopped, as against creditors, on principles of fair dealing, from repudiating the contract and liability when he discovers the facts, because he has never knowingly or negligently deceived them to their injury. So are the American authorities that have treated of such fraudulent contracts (Bank v. Newbegin, 40 U. S. App. 1, 20 C. C. A. 339, and 74 Fed. 135; Improvement Co. v. Merrill, 2 U. S. App. 434, 2 C. C. A. 629, 52 Fed. 77, 80; Upton v. Tribilcock, 91 U. S. 54; Winters v. Armstrong, 37 Fed. 516, 517; Duffield v. Iron Works [Mich.] 31 N. W. 310, 316), and they clearly mark and strongly emphasize the distinction between the cases relied upon in the opinion of the majority and that now before us. In all the cases cited by the majority either a valid contract of subscription or purchase existed, or the stockholders were estopped from rescinding a voidable contract because they had acted as such after they knew, or might have known, the facts upon which they relied to avoid it. In the case at bar the contract was induced by fraud, and it was concealed by fraud. In this case no estoppel against the plaintiff in error can be sustained, because he did not know and could not learn the facts, and no duty to speak or act rested upon him until he acquired that knowledge, or means of knowledge. It may be that upon a trial of this case evidence could be adduced which would estop him from repudiating the purchase of this stock; but upon the admitted allegations of his answer here there are several reasons why I think he is not barred as against this receiver and the creditors he represents from obtaining the relief he seeks.

An estoppel arises only when one knowingly or negligently represents to another, who is ignorant, and relies and acts upon the representation, to his injury, that a fact or condition exists which has no existence. An essential element of such an estoppel is a willful intent to deceive, or such gross negligence of the rights of others as is tantamount thereto. There must be some moral turpitude, or some breach of duty. Henshaw v. Bissell, 18 Wall. 255, 271; Bank v. Farwell, 58 Fed. 633, 636, 639, 7 C. C. A. 391, 394, 396, and 19 U. S. App. 256, 262, 265; Insurance Co. v. McMaster, 30 C. C. A. 532, 87 Fed. 63, 66. Mr. Justice Field, speaking of this estoppel, in Henshaw v. Bissell, says:

"For its application there must be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud. An estoppel in pais is sometimes said to be a moral question. Certain it is that to the enforcement of an estoppel of this character, such as will prevent a party from asserting his legal rights to property, there must generally be some degree of turpitude in his conduct which has misled others to their injury. Conduct or declarations founded upon ignorance of one's rights have no such ingredient, and seldom work any such result."

As long as the plaintiff in error did not know, and could not learn by the use of reasonable diligence, the facts constituting the fraud upon him until after the bank had incurred its debts to all its creditors, he was not guilty of any breach of duty to them, or of any negligence of their rights, or of any intent to deceive them, and they cannot sustain the plea of an estoppel against him.

Another requisite ingredient of an estoppel by conduct or declarations is that the party claiming its benefit has acted upon it in such a way that he will be injured if the natural inference from it is denied. The deceit of the victim of the representations and consequent damage from their denial are indispensable to the existence of the estoppel. Insurance Co. v. McMaster, 30 C. C. A. 532, 87 Fed. 63, 66; Bonsack Mach. Co. v. S. F. Hess & Co., 68 Fed. 119, 135, 15 C. C. A. 303, 318, and 25 U. S. App. 315, 341. There is nothing in this record to show that any creditor of this bank loaned his money to it or deposited his funds with it in reliance upon the fact that the plaintiff in error appeared to own 50 shares of stock in it, and I am aware of no presumption of law or of fact which makes it our duty to reach this conclusion in the absence of pleading and proof. Moreover, an estoppel does not operate in favor of everybody. No one can set it up, or derive any benefit from it, who has not been misled by the misrepresentation or conduct to his injury. Ketchum v. Duncan, 96 U. S. 659, 666; The Howard Carroll, 14 U. S. App. 506, 6 C. C. A. 320, and 57 Fed. 243; In re Harris, 57 Fed. 243, 246, 6 C. C. A. 320. If it were conceded that a creditor of the bank, who was induced to become such by his reliance upon the fact that the plaintiff in error appeared to have 50 shares of stock, could estop him from escaping from a liability thereon, that estoppel could not inure to the benefit of any creditor who was not induced to become such, in reliance upon that fact. If there were some creditors who were and some who were not induced to become such in reliance upon this fact, the receiver could not derive any benefit from it in this suit, because he can enforce only the common rights and claims of all the creditors, and he cannot plead or urge the personal claims of individual creditors which are not common to all. He cannot enforce an estoppel which may belong to one-third or one-tenth of the creditors, and distribute the proceeds he derives from it among them all. The right of a creditor to enforce such an estoppel is a personal right, which no one but the creditor misled by the representation can urge; and the receiver cannot avail himself of it, unless all the creditors have been induced to loan their money to this bank by the apparent ownership of its stock by the plaintiff in error. There is neither plea nor evidence of such a state of facts in this case. Indeed, the pleadings show that when this stock was subscribed the bank owed more than the value of all its assets. A state of things once shown to exist is presumed to continue; and where, as in this case, it appears that a bank owed more than the value of all its property in 1890 and again in 1894, the presumption that it had paid all of its old creditors, and become indebted to new ones, during this four years, would be contrary to the common experience and observation of business men, violent, and unreasonable. The strong probability is that most of the creditors of this bank loaned their money to it prior to 1890, and they surely cannot plead an estoppel. Whether they did or not, I am strongly of the opinion that the plaintiff in error is entitled to pleading and proof that some or all of these creditors loaned their money in reliance upon his ownership of the stock before an estoppel against him is found. "A creditor who has been defrauded by misrepresentation of the real capital of the com-

pany has his remedy in an action of tort against all who participated in the fraud. But the wrong done to him cannot entitle the entire body of creditors, who have not suffered from the alleged fraud, to recover of the entire body of stockholders, who have taken no part in it." Scovill v. Thayer, 105 U. S. 143, 151.

Finally, even if the fact were established that a creditor loaned his money since 1890 in reliance on the ownership of the stock of the plaintiff in error, I am unable to perceive any right or equity in his claim superior to that of the plaintiff in error. In that case they were both deceived by the same fraud. They were both kept in ignorance of the actual facts by the same falsifications and devices, and I see no reason why one of the victims of such a wrong should be allowed to prey upon the other. The bank induced the plaintiff in error to play the part of a stockholder, and thereby to lose all the money he deposited with it, and to run the risk of liability to lose as much more by the same scheme of false representations of its solvency, of its flourishing condition, and of its increase of stock, which doubtless induced the creditor to take the bank's promise of repayment for the money he deposited with it. In such a case, why should not the right of the purchaser of stock who suffers the greater wrong be equal to that of the creditor who suffers less? Neither of them was aware of the fraud. Neither of them did or could discover it until both were injured. Neither of them knowingly or negligently deceived the other, and, in my opinion, neither of them is entitled to estop the other from undoing the fraud from which they suffer. Bank v. Newbegin, 74 Fed. 135, 140, 20 C. C. A. 339, 344; Improvement Co. v. Merrill, 2 U. S. App. 434, 439, 440, 2 C. C. A. 629, 632, and 52 Fed. 77, 80; Upton v. Tribilcock, 91 U. S. 45, 54; Winters v. Armstrong, 37 Fed. 512, 516, 517; Duffield v. Iron Works (Mich.) 31 N. W. 310, 316.

The other question in this case is, does the subscriber for shares in the proposed increase of the capital stock of a national bank, under an understanding with the bank that his money on deposit there shall be used to pay his subscription only when the entire increased capital is paid in, become a stockholder of the bank, and liable as such, when all the increased capital is subscribed for, but only two-thirds of it is paid in, and the bank appropriates his money to its own use, sends him a certificate of stock, and falsely represents that the entire increased capital has been paid in? I cannot persuade myself that this question should be answered in the affirmative. The answer pleads that the plaintiff in error agreed to purchase his stock on the express condition that he should not take it, and his $5,400 on deposit with the bank should not be used to pay for it until the entire $150,000 of proposed increase of capital was paid in. The condition was never fulfilled, the increased capital was never paid in, and upon familiar principles the subscriber never became a stockholder. The fact that the bank falsely represented to him that the condition had been complied with, and so falsified its books that its falsehood appeared to be the truth, and the subscriber believed it, cannot change the fact, or its legal effect. It was the fact of payment, and not the bank's false statement regarding it, that conditioned the contract of subscription; and, as that condition was never fulfilled, and as the subscriber never

learned, and never could learn until after the failure of the bank, that it was not complied with, so that he did not waive it, he never became a stockholder by the express terms of his contract of purchase.

Moreover, I am unable to concur in the view that the proper construction of the provision of section 5142 of the Revised Statutes that "no increase of capital shall be valid until the whole amount of such increase is paid in," is that every increase of capital is valid any part of which is paid in, and I am unable to see how the judgment in this case can be sustained without adopting exactly that interpretation of this clause of the statute.

In Delano v. Butler, 118 U. S. 634, 649, 7 Sup. Ct. 39, 44, and in McFarlin v. Bank, 16 C. C. A. 46, 50, 68 Fed. 868, 872, it was held that:

"Three things must concur to constitute a valid increase of the capital stock of a national banking association: First, that the association, in the mode pointed out in its articles, and not in excess of the maximum prescribed by them, shall assent to an increased amount; second, that the whole amount of the proposed increase shall be paid in as part of the capital of such association; and, third, that the comptroller of the currency, by his certificate, specifying the amount of such increase of capital stock, shall approve thereof, and certify to the fact of its payment."

I do not understand that the supreme court has modified or departed from this holding in the later cases of Aspinwall v. Butler, 133 U. S. 595, 10 Sup. Ct. 417; Bank v. Eaton, 141 U. S. 227, 11 Sup. Ct. 984; and Thayer v. Butler, 141 U. S. 234, 11 Sup. Ct. 987. In each of those cases the amount of increase originally proposed was $500,000, but only $461,300 was actually subscribed and paid in. When this had been done, the bank modified its proposal, limited the amount of its increase to $461,300, notified the comptroller that this amount had been subscribed and paid in, and he issued his certificate for and approved the increase, not of $500,000, but of $461,300. In this state of facts the court held the increase valid. The key to these decisions is found, however, in the holding of that court in Delano v. Butler that the three conditions of the act of congress had been exactly fulfilled. It said:

"In the present case the association did, in fact, finally assent to an increase of the capital stock, limited to $461,300. That amount was paid in as capital, and the comptroller of the currency, by his certificate, approved of the increase, and certified to its payment; so that there seems little room to question the validity of the proceedings resulting in such increase. All the requisitions of the statute were complied with. The circumstance that the original proposal was for an increase of $500,000, subsequently reduced to the amount actually paid in, does not seem to affect the question, for the amount of the increase within the maximum was always subject to the discretionary power of the association itself, exerted in accordance with its articles of association, and to the approval and confirmation of the comptroller of the currency." 118 U. S. 649, 7 Sup. Ct. 44.

I agree that, if the Bank of Sedalia, after it had proposed the increase of $150,000, had obtained subscriptions and payment in full for $100,000 of increased stock, and had then limited its increase to that amount, reported that fact, and that the $100,000 had been paid in, and had obtained from the comptroller his certificate and approval of an increase, not of $150,000, but of $100,000, the new stock would

have been valid. But could that bank issue valid increased stock for $150,000 when only $100,000 was actually paid in, in the teeth of the plain declaration of the statute that no increase shall be valid until the whole amount of such increase is paid in? Could it issue valid new stock for $150,000 when only $1,000 or $100 was actually paid in? That is the real question in this case. The pleadings concede that the bank proposed an increase of $150,000, that this amount was subscribed for, that the comptroller was induced by the false representations of the bank to certify and approve an increase of that amount, and that only two-thirds of that amount was actually paid in. The evils against which that clause of the statute was directed were that, if the new stock was issued without payment of the entire amount of the increase, the stock would be watered; the bank would be doing business on an apparent capital, which it did not in fact possess; and the stockholders who paid for their stock would be wrongfully placed on an equality with those who held stock that was only partly paid for, or was not paid for at all. In the cases arising out of the failure of the Pacific National Bank these evils did not result, because the $461,300 actually paid in was the limit of the increase finally fixed by the bank, and certified and approved by the comptroller. But in the case at bar they have resulted. The increase proposed by the bank and the increase certified was $150,000, while only $100,000 was paid in. The stock was watered. The apparent capital was $50,000 more than the real capital. Every stockholder who paid for his stock was put on an equality with those who had not paid at all, or who had paid in part only. The pretended increase of the capital of this bank falls clearly and literally within the plain provision of the act of congress, "no increase of capital shall be valid until the whole amount of such increase is paid in"; and in Aspinwall v. Butler, 133 U. S. 608, 10 Sup. Ct. 421, the supreme court decided it in that case when it said, "This clause would have been violated by an issue of $500,000 of new stock when only $461,300 was paid in, but not by an. issue of the exact amount that was paid in." That is this case. New stock to the amount of $150,000 was issued, while only $100,000 was paid in; and because this pretended increase of capital has produced the very evils which the statute was enacted to prevent, because it violates the plain terms of the act of congress, and because the supreme court so held in Aspinwall v. Butler, I have been forced to the conclusion that the new stock issued by this bank was invalid, and that the plaintiff in error is not liable upon it as a stockholder. I concede, as was held in Aspinwall v. Butler and in Thayer v. Butler, 141 U. S. 234, 11 Sup. Ct. 987, that a subscription to a proposed increase of stock contains no implied condition that the entire increase proposed shall be subscribed and paid for, because it is discretionary with the bank and the comptroller to reduce or change that amount at any time before it is certified and approved by the latter. But, in my opinion, every such subscription is made upon the express condition, clearly set forth in the statute, that it shall not be valid if the amount of the increase of capital finally reported to the comptroller and certified and approved by him exceeds the amount actually paid in for the new stock. Compliance with this condition is not discretionary with the bank or

with the comptroller; and as, in the case at bar, it was never fulfilled, and that fact was fraudulently and successfully concealed from the plaintiff in error until the bank failed, so that he never waived the condition, he cannot, in my opinion, be justly held liable for any of the debts of this bank. I think the judgment below should be reversed.